**SHAKER MEDICAL CENTER HOSPITAL, Plaintiff-Appellant,**

**v.**

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.**

**No. 81-3265.**

United States Court of Appeals, Sixth Circuit.

Argued April 13, 1982.

Decided Sept. 1, 1982.

**1204**

William F. Snyder, Marshman, Snyder & Corrigan, Glenn Waggoner, Cleveland, Ohio, for plaintiff-appellant.

Richard French, Asst. U. S. Atty., Cleveland, Ohio, Carolyn Cozad-Hughes, Asst. Regional Atty., U. S. Dept. of HHS, Chicago, Ill., for defendant-appellee.

Before ENGEL, Circuit Judge, PHILLIPS, Senior Circuit Judge, and DUMBAULD,* District Judge.

PHILLIPS, Senior Circuit Judge.

Plaintiff-appellant, the Shaker Medical Center Hospital (Shaker) is a nonprofit corporation which participates in the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395rr, as a provider of services. A designated intermediary, Blue Cross of Northeast Ohio (Intermediary), administers the Medicare program in the Northeast Ohio area.

In reimbursing Shaker for its expenses incurred in providing Medicare services for the fiscal years ending December 31, 1974, and December 31, 1975, the Intermediary disallowed certain depreciation and interest expenses claimed by Shaker in connection with its purchase of the hospital building in which it operates. The Intermediary determined that the transaction was not bona fide, that Shaker and Lee-Allan Inc., the company from which Shaker purchased the building, were "related entities," and that Shaker was not entitled to any reimbursement in excess of the original cost to Lee-Allan.

Shaker objected to the decision of the Intermediary and filed a request for a hearing before the Provider Reimbursement Review Board (the Board). After a hearing the Board upheld the Intermediary decision. The determination of the Board became final agency action when the Administrator of the Health Care Financing Administration declined to modify the decision of the Board.

Shaker then brought the present action in the district court pursuant to 42 U.S.C. § 1395oo (f) for review of the decision of the Secretary. Shaker and the Secretary filed cross motions for summary judgment. District Judge John M. Manos granted summary judgment for the Secretary. This appeal followed. We affirm.

* Senior District Judge, Western District of Pennsylvania, sitting by designation.

## I

Under the Medicare program, as established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–95rr, providers of services such as appellant are reimbursed for the "reasonable cost" of providing the services. 42 U.S.C. §§ 1395f(b) & 1395*l*(a). "Reasonable cost" is defined in 42 U.S.C. § 1395x(v) which provides, in part, that:

(v)(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services;

42 U.S.C. § 1395x(v)(1)(A).

Three regulations promulgated by the Secretary pursuant to the above statutory authority and the interpretation of those regulations are the subjects of this appeal.

42 C.F.R. § 405.415(a) provides that "appropriate allowance for depreciation on buildings and equipment used in the provision of patient care is an allowable cost." 42 C.F.R. § 405.415(g) provides for the establishment of the cost basis when a facility is purchased as an ongoing operation, and that if the provider which purchased the facility "cannot demonstrate that the sale was bona fide ... the purchaser's cost basis shall not exceed the seller's cost basis, less accumulated depreciation."

42 C.F.R. § 405.427 is a special limitation on the amounts reimbursable for "costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control." Essentially the regulation seeks to insure that the costs reimbursed in such situations do not exceed what the costs would be if the provider obtained the services from an unrelated organization. It implements this objective by providing that the cost reimbursed shall be the *supplier's* cost, and *not the provider's*, and in any event "must not exceed the price of compa-

rable services, facilities or supplies that could be purchased elsewhere." § 405.-427(a). The regulation looks not to what the provider paid for the services, facilities or supplies, but to the cost to the related supplier.

42 C.F.R. § 405.419 provides that an allowable cost for reimbursement is "necessary and proper interest on both current and capital indebtedness." § 405.419(a). The regulation further provides that "proper" interest must "be incurred at a rate not in excess of what a prudent borrower would have had to pay" at the time of the loan, § 405.419(b)(3)(e) and "be paid to a lender not related through control or ownership, or personal relationship to the borrowing organization." § 405.419(b)(3)(ii).

The objective of these regulations is to avoid paying collusive or improperly inflated medical costs which may be brought about by sales and transactions between closely related entities. Shaker, the provider, asserts that the application of the Secretary to the above "related organizations" regulations of the sale of the Hospital building from Lee-Allan Inc. to Shaker is not supported by substantial evidence. In the alternative, Shaker argues that either the Secretary incorrectly interpreted the regulations or that the result reached under them is arbitrary, capricious and not in accordance with the Secretary's statutory directive from Congress.

We reject the arguments of appellant.

## II

The important facts for purposes of this appeal are those dealing with the nature of the "relatedness" of Shaker and Lee-Allan Inc., and the circumstances surrounding the sale of the hospital building from Lee-Allan to Shaker. Dr. Victor Ippolito is the central figure in the transaction.

In the 1950s Dr. Ippolito formed Lee-Allan Inc. for the purpose of constructing a medical building. Dr. Ippolito and his wife were the sole shareholders of Lee-Allan.

Dr. Ippolito also was one of the original incorporators of Shaker in November 1961.

The other two incorporators were Charles Rehor, Dr. Ippolito's accountant and attorney, and Dr. Vincent Castrigano, a dentist who was a tenant in the Lee-Allan building. An additional one and one-half floors were added to the Lee-Allan building and the space was leased to Shaker. All of Shaker's medical operations were housed in this building.

Although Shaker had been incorporated as a non-profit organization, the Eighth District Court of Appeals of Ohio found in 1962 that Shaker was being operated for profit by Dr. Ippolito. Although Dr. Ippolito was the Chairman of the Board of Trustees, president of the corporation and the administrator of the medical staff of Shaker, he was making a profit by supplying Shaker its building, laboratory services, X-ray equipment and electrocardiogram services.

In order to maintain Shaker's non-profit status and to obtain a contract for payment for services from Blue Cross of Northeast Ohio, Dr. Ippolito resigned most of the positions he held at Shaker. He retained his position on the Board of Trustees, however, and continued to be Shaker's landlord through his control of Lee-Allan, Inc. The ten year lease between Lee-Allan and Shaker expired in August 1972 and was not renewed, although Shaker continued to lease the property, presumably at the same terms. By this time Shaker had expanded to occupy almost the entire building.

In June 1973, Dr. Ippolito, Charles Rehor, and William Snyder, counsel for Shaker and one of the members of the Board of Trustees, formed a partnership, I & S Realty. On June 4, 1973, I & S contracted to buy certain property which was adjacent to the building.

In a July 31, 1973, meeting of the Board of Trustees of Shaker, the question was raised as to whether Shaker should acquire the stock of Lee-Allan, Inc. Beginning early in that year, Shaker had considered acquiring the Lee-Allan building and the adjacent property. Shaker did not have enough capital to buy both, however. At this meeting of the Board of Trustees Snyder told the Board that he *would buy* the adjacent property and hold it for Shaker's use. Shaker now rents this adjacent building and property and uses it for administrative offices, laboratory, snackbar and maintenance facilities. Snyder advised the Board of Trustees that this procedure would clear the way for the purchase of the Lee-Allan building.

Dr. Ippolito had informed the Board of Trustees that a group of podiatrists had approached him with an offer of $1,200,000 for the Lee-Allan building. Mr. Snyder represented that he knew such an offer had been made and strongly recommended that the Board approve the purchase of Lee-Allan, Inc., at that price, $1,200,000. The Board of Trustees approved the resolution by a vote of 16–0, with two abstentions. Dr. Ippolito voted in favor of the purchase.

The sale of Lee-Allan, Inc. to Shaker was structured as a stock purchase due to estate tax considerations of Dr. Ippolito. The $1.2 million purchase was financed with a $100,000 down payment by the hospital, by $700,000 in loans from lending institutions at nine per cent and ten per cent interest, and by a $400,000 note to Dr. Ippolito at seven per cent interest.

After Shaker acquired the stock of Lee-Allan, Inc., Lee-Allan was changed to a non-profit corporation and merged into Shaker, which became the surviving parent corporation. As a result of the transaction, Shaker was able to purchase the building that it had been renting with a cash flow burden only slightly more than that incurred while it was renting.

The $1.2 million purchase was not a bargain, however. A number of appraisals of the Lee-Allan property have been conducted, and none valued the property at over $885,000. In fact, Shaker has produced no evidence that the property actually was worth $1.2 million on the date of the purchase. All of the evidence in the record indicates that the opposite is true and that the price paid by Shaker was exorbitant. Shaker has been unable to produce evidence of a concrete offer from the "group of podiatrists" to purchase the building for the $1.2 million figure.

For the years of 1974 and beyond, Shaker used an increased asset depreciation figure under 42 C.F.R. § 405.415 and an increased interest cost figure under 42 C.F.R. § 405.-419, based upon the increases resulting from the purchase of the Lee-Allan property. The Intermediary for the Medicare program audited the costs claimed by Shaker for the years 1974 and 1975. The Intermediary disallowed these increased costs on the grounds that Shaker had not shown the purchase to be bona fide and reimbursable under 42 C.F.R. § 405.415 and that, in any event, Lee-Allan was a related party and, therefore, the stepped-up acquisition cost basis was not allowable under 42 C.F.R. § 405.427; and that the interest paid to Dr. Ippolito, a related party, was not allowable under 42 C.F.R. § 405.419.

### III

The scope of judicial review of the decision of the Secretary is governed by 42 U.S.C. § 1395oo(f), which provides in pertinent part that the action "shall be tried pursuant to the applicable provisions under chapter 7, of title 5, United States Code...." These are the provisions for judicial review of agency action under the Administrative Procedure Act. The relevant parts of the APA provide that a court may set aside agency action that is "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); contrary to a constitutional right, power, privilege or immunity, 5 U.S.C. § 706(2)(B); or unsupported by substantial evidence in cases where an agency hearing is reviewed on the record, 5 U.S.C. § 706(2)(E).

### IV

■ Our review of the record convinces this court that there is substantial evidence to support the finding that Dr. Ippolito, Lee-Allan and Shaker were related entities for the purposes of 42 C.F.R. §§ 405.419 & 405.427. Section 405.427(b) defines "related to provider" as follows: "Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies." "Control" is found to exist "where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution."

In reviewing the Intermediary's determination, the Provider Reimbursement Review Board agreed that Dr. Ippolito "controlled" Shaker as well as Lee-Allan, Inc.:

> The Board is in agreement with the Intermediary's contention that Dr. Ippolito, from the formation of the Hospital, had the power, directly or indirectly, significantly to influence or direct the actions or policies of the Hospital. It is difficult to quantify the degree of control which Dr. Ippolito exercised over the Hospital; however, when one considers that Dr. Ippolito (1) was the founder of the Hospital; (2) was responsible for ⅓ of the patient days; (3) was responsible for both nominating (as a member of the Nominating Committee of the Board) and appointing (as a member of the Corporation) Trustees to the Board of the Hospital; (4) was a Trustee himself; and (5) was the landlord (through his control of Lee-Allan, Inc.) of the Hospital at a time when the Hospital was leasing the hospital building without the benefit of a written lease, it becomes apparent that Dr. Ippolito had "control" over the Hospital as the term is defined at 42 C.F.R. § 405.427(b)(3).

While there is additional evidence of control in the record, the above facts alone constitute substantial evidence to support a finding of relatedness within the meaning of 42 C.F.R. § 405.427. Moreover, when the circumstances surrounding the entire transaction are considered, it is obvious that this situation is precisely the type to which § 405.427 was intended to apply. The conclusion is inescapable that the entire transaction was either orchestrated by Dr. Ippolito or at least for his benefit. He was a key participant on both sides of the transaction. He and his partners bought the surrounding

property before the July 31 meeting, yet his partner, Mr. Snyder, told the Board of Trustees that he *would buy* the property and hold it for Shaker. The Trustees had decided that Shaker needed to control both the Lee-Allan property and the adjacent property in order to assure a viable future for the hospital at that location. At this same time, Dr. Ippolito allowed the lease to Shaker to expire. Thus Shaker had no lease protection nor the right of first refusal contained therein to protect it from going out of business in the case of a sale of the property by Dr. Ippolito to another purchaser.

At the Board of Trustees meeting on July 31, 1973, Dr. Ippolito, through his partner, Mr. Snyder delivered the ultimatum. He stated that a "group of podiatrists" had expressed a willingness to buy the Lee-Allan property for $1.2 million. Shaker could either buy the property at that price or face the possibility of going out of business. Neither Mr. Snyder nor Dr. Ippolito advised the Trustees that there had never been a concrete written offer by this "group of podiatrists" or that any offer that might have been made had been withdrawn before the date of the meeting.

The Trustees asked no questions. They accepted Dr. Ippolito's price without obtaining an independent appraisal. They even structured the transaction so as to give Dr. Ippolito the maximum estate tax benefit. They paid a price which was $315,000 higher than the highest appraised value ever given to Lee-Allan, Inc.

These same facts comprise substantial evidence to support a finding that Shaker has not shown the transaction to be "bona fide" within the meaning of 42 C.F.R. § 405.-415(g). Therefore, the Secretary was justified, under either § 405.415(g) or § 405.427, in disallowing depreciation expenses computed on a stepped-up basis which exceeded the basis of Dr. Ippolito. In addition, the Secretary was justified in disallowing reimbursement for the interest paid to Dr. Ippolito, since under 42 C.F.R. § 405.419 it was paid to a related entity; and in any event under 42 C.F.R. § 405.415 and § 405.-

427 the loan from Dr. Ippolito was for money that should never have been borrowed.

### V

■ Shaker argues that even if there is substantial evidence to support the position of the Secretary, the application of the regulations in the present case is either arbitrary and capricious or produces an arbitrary and capricious result not contemplated by the Medicare statutes.

First, Shaker argues that the Secretary erroneously applied 42 C.F.R. § 405.427, the "related to provider" regulation, in denying reimbursement. First, even if § 407.427 does not apply and only § 405.415 is applicable, the Secretary was justified in denying reimbursement for the costs at issue on this appeal since there was substantial evidence that the financial terms of the transaction, though legally sufficient to pass title and for the purposes of the parties to it, were not shown to be "bona fide" under the terms of § 405.415(g)(3).

We find this contention to be without merit. First, even if § 407.427 does not apply and only § 405.415 is applicable, the Secretary was justified in denying reimbursement for the costs at issue on this appeal since there was substantial evidence that the transaction was not shown to be "bona fide" under the terms of § 405.-415(g)(3).

Second, the agency's interpretation of its own regulations is entitled to considerable deference, *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Shaker strongly relies on *South Boston General Hospital v. Blue Cross of Virginia,* 409 F.Supp. 1380 (W.D.Va.1976). Other federal courts have rejected the reasoning of *South Boston* and have found § 405.427 applicable to one-time sales as well as to ongoing relationships such as a lease or the providing of services. *See, e.g., Goleta Valley Community Hospital v. Schweiker,* 647 F.2d 894 (9th Cir. 1981); *Medical Center of Independence v. Harris,* 628 F.2d 1113 (8th Cir. 1980); *Pasadena Hospital Ass'n v. United States,* 618 F.2d 728, 734 (Ct.Cl.1980).

The *South Boston* case involved a unique set of circumstances. The equities weighed heavily in favor of allowing full depreciation. The agency review panel expressed its reluctance to reach its decision but felt itself bound by the proper interpretation of the regulations. It found that its decision had a "particularly harsh effect on the provider." 409 F.Supp. at 1386. The Intermediary had found also that the "provider acted in good faith to make the transaction bona fide." *Id.* at 1387. The entire transaction had been undertaken to benefit the community, and "because of the rural nature of the locale, the only persons with the requisite management experience were the former owners, and they became the trustees of the new provider." *Id.*

Similarly, Shaker's reliance upon *Trustees of Indiana University v. United States,* 618 F.2d 736 (Ct.Cl.1980) to prevent the application of 42 C.F.R. § 405.419 is misplaced. Under §§ 405.415 and 405.427, it is clear that the loan from Dr. Ippolito was for an unnecessary and unallowable expense. It follows that the interest on this loan should not be an allowable expense. Further, *Indiana University* involved very special circumstances, and after that case was decided the Court of Claims upheld the validity of § 405.419. *Jackson Park Hospital Foundation v. United States,* 659 F.2d 132, 137 (Ct.Cl.1981). The court in *Jackson Park* distinguished *Indiana University* because in that case "there was no suggestion that the loans were unnecessary" and because "the circumstances [in *Indiana University*] virtually ruled out the likelihood of collusion or undue influence of any kind...." *Id.* at 137–38. The present case likewise is distinguishable from *Indiana University.*

Finally, Shaker argues that the results produced by the application of the regulations to its situation are arbitrary and capricious and violate the intent of the Medicare statutes. Shaker argues that the Secretary should be required to scrutinize the costs line-by-line and item-by-item in every transaction between related entities. Shaker agrees that the per se prophylactic regulations are appropriate in some circumstances, but it contends that the better rule would be to scrutinize carefully every situation where there is either real or potential control between the provider and supplier.

We reject Shaker's final argument for two reasons. It is within the power of an agency to promulgate prophylactic regulations which are broad in scope in order to effectuate the purposes of the enabling legislation. *Mourning v. Family Publications Service,* 411 U.S. 356, 372–73, 93 S.Ct. 1652, 1662, 36 L.Ed.2d 318 (1973). The regulations at issue in this appeal reasonably support the legitimate goals of avoiding payment of collusive or improperly increased costs with a minimum of administrative burden. While the prophylactic regulations might prove "in particular cases to be 'under-inclusive' or 'overinclusive,' in light of [their] presumed purpose, nonetheless [they are] ... widely accepted response[s] to legitimate interests in administrative economy and certainty of coverage for those who meet [their] terms." *Weinberger v. Salfi,* 422 U.S. 749, 776, 95 S.Ct. 2457, 2472, 45 L.Ed.2d 522 (1975) (discussing a prophylactic statutory rule). Our inquiry in reviewing the regulations and their applications is whether the agency in following its statutory directives "could rationally have concluded both that the particular limitation or qualifications would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule." *Id.* at 777, 95 S.Ct. at 2472. We conclude that the regulations satisfy this standard.

There is little doubt that a line-by-line, item-by-item examination of the costs in every transaction between related parties could prove to be expensive and time consuming, thereby reducing the amount of funds available for the payment of services. Further, the danger of collusive or improperly increased costs in transactions involving related entities is particularly great. Under proper standards of review, these regulations must be upheld as valid. *See, e.g., Jackson Park Hospital, supra,* 659 F.2d

at 136–37; *Goleta Valley Community Hospital v. Schweiker, supra,* 647 F.2d at 897 (9th Cir. 1981).

Further, at the very least, the regulations place the burden on the provider to demonstrate that the transaction between the related parties was "bona fide." See 42 C.F.R. §§ 405.415(g)(3) & 405.427(d). Shaker has not made such a showing. In fact, in essence Shaker is asking the Secretary to do what its Board of Trustees failed to do. Shaker asks the Secretary to examine the reasonableness of the transaction and at least permit the recovery of any costs to the extent that they are reasonable. We reemphasize that when the purchase of Lee-Allan was proposed to the Board of Trustees at the July 31 meeting, the Trustees never questioned the reasonableness of the transaction. They never examined or requested appraisals of the property. They did not require proof of the offer from the "group of podiatrists." They did not even question the owner of the property, Dr. Ippolito, about the transaction, even though he was present at the meeting and voted in favor of the sale. The statute was not designed to authorize reimbursement of expenses incurred through inattentative management. The burden is on the provider to "keep its house in order" and justify its expenses to the Secretary.

We recognize that there have been cases in which special circumstances were held to justify reversal of the decision of the Secretary to apply these regulations. *See, e.g., Indiana University, supra,* 618 F.2d 736; *South Boston, supra,* 409 F.Supp. 1380; *Richlands Medical Ass'n v. Harris,* 651 F.2d 931 (4th Cir. 1981) (allowing reimbursement for the amount that bargaining arms length would have produced since the provider had been paying a reasonable rent for several years before the provider and the lessor became "related"). The present appeal does not present a proper case to make exceptions to the prophylactic rules of the Secretary. As the court stated in *Jackson Park, supra,* 659 F.2d 132, 137, n.12, "[i]f there is any exception [to the regulations] for plain injustice where the seller is a profit entity, we could not utilize it here."

This transaction is the type to which the Secretary's regulations were meant to apply.

The summary judgment of the district court is affirmed. No costs are taxed. Each party will bear its own costs on this appeal.