624 A.2d 941

**LIBERTY NURSING CENTER, INC.**
**t/a Granada Nursing Home**

v.

**DEPARTMENT OF HEALTH AND MENTAL HYGIENE.**

No. 70, Sept. Term, 1992.

Court of Appeals of Maryland.

May 17, 1993.

Stephen J. Sfekas (Weinberg and Green, brief), Baltimore, for petitioner.

Lawrence J. Ageloff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Maureen M. Dove, Asst. Atty. Gen., brief), Baltimore, for respondent.

Argued before ELDRIDGE, RODWOSKY, McAULIFFE, CHASANOW, KARWACKI, ROBERT M. BELL and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (Retired, Specially Assigned), JJ.

ROBERT M. BELL, Judge.

We granted certiorari to determine whether regulations pertaining to related organizations preclude reimbursing

the provider for interest paid to a non-related, commercial lender, pursuant to a loan the provider made to finance the purchase, from a related organization, of nursing home facilities. The Court of Special Appeals held that they do. *Liberty Nursing Center, Inc. v. Dept. of Health & Mental Hygiene,* 91 Md.App. 210, 220–21, 603 A.2d 1344, 1348–49, *cert. granted,* 328 Md. 35, 612 A.2d 897 (1992). We shall reverse.

I.

Liberty Nursing Center, Inc., t/a Granada Nursing Home ("Liberty"), the petitioner, is the operator of a 112 bed licensed nursing home in Baltimore City. It participates in the Maryland Medical Assistance Program ("Medicaid"), a State program partially funded by the federal government, which reimburses nursing homes for their patient related costs of medical care rendered to indigent or medically indigent persons. Almost 100 percent of Liberty patients receive medical assistance.

Michael DeFontes ("DeFontes") currently owns 55 percent of Liberty, the remainder being owned by his brother. It was previously owned by DeFontes's grandmother, Margaret Wessels, who also owned land and a building ("the facilities"), which she leased to Liberty for operation of the nursing home. After Wessels's death, that lease was continued with, however, the Wessels estate as lessor. DeFontes, who also is one of his grandmother's heirs, qualified as personal representative of the estate.

In addition to the building and grounds leased to Liberty, the assets of the Wessels estate consisted of a personal residence, a promissory note, and other miscellaneous property. As a result, estate tax assessments totaled more than $400,000.00—$373,012.30 for federal estate taxes and $37,-522.07 for Maryland estate taxes. Because the Wessels estate had insufficient liquid assets to pay them, counsel sought to postpone the payment of the federal estate taxes. That effort proved to be only partially successful, the IRS

agreed to defer payment for only one year, which prompted counsel to advise DeFontes that it would be necessary to sell the facilities to pay the estate taxes and close the estate.

Rather than sell to a third party, DeFontes purchased the facilities himself. He paid one million two hundred thousand dollars ($1,200,000) for them. The State had previously appraised the facilities, for Medicaid reimbursement purposes, at approximately two million dollars ($2,000,000). The purchase was financed with a loan DeFontes negotiated, at arms length, from First American Bank, at 11 percent interest and secured by a mortgage on the facilities. DeFontes has neither an ownership interest in, nor control of, First American Bank.

As required by Medicare regulations, Liberty filed a cost report with the Maryland Medical Assistance Program at the end of the fiscal year. Included in that report as an allowable cost was an interest expense ($135,808) paid to First American Bank in connection with the DeFontes loan. Clifton, Gunderson & Company, the accounting firm under contract with the State of Maryland to perform audits of nursing homes cost reports, disallowed the interest on the grounds that Liberty, through DeFontes, and the Wessels estate were "related organizations." Liberty appealed the proposed cost settlement incorporating this disallowance to the Nursing Home Appeal Board ("NHAB" or the "Board").[1] When the Board affirmed, Liberty sought judicial review in the Circuit Court for Baltimore City, pursuant to Md.Code (1990, 1992 Cum.Supp.) § 15–108(f) of the Health General Article. That court also affirmed, whereupon Liberty unsuccessfully appealed to the Court of Special Appeals. We granted its petition for certiorari to consider the important issue raised therein.

---

1. Md.Code (1990, 1992 Cum.Supp.) § 15–108 of the Health General Article provides for the establishment and appointment of appeal boards to which an aggrieved party may appeal the results of a field verification. The Nursing Home Appeal Board is one such board. *See* Md.Regs.Code tit. 10, § 01.09.

## II.

The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, which is subsidized by both state and federal funds, has as its purpose the provision of medical assistance to persons whose income and resources are insufficient to meet the cost of necessary medical care and services. *See* 42 U.S.C. § 1396; Md.Code (1990, 1992 Cum.Supp.) § 15–103 of the Health–Gen. Article. It requires that providers of necessary medical care and services be reimbursed at "reasonable and adequate" rates, 42 U.S.C. § 1396a(a)(13)(A), which is the cost actually incurred, as determined in accordance with federal regulations, promulgated pursuant to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, "establishing a method or methods to be used, and the items to be included[.]" 42 U.S.C. § 1395x(v)(1)(A). The regulations provide that, to be reimbursable, costs must be "reasonable," "necessary," and "related to the care of beneficiaries." 42 C.F.R. § 413.9(a). Costs incurred by nursing homes participating in the Medicaid program are reimbursed:

... through the use of rates (determined in accordance with methods and standards developed by the State) ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards....

42 U.S.C. § 1396a(a)(13)(A).

In Maryland, the Department of Health & Mental Hygiene is authorized to "adopt rules and regulations for the reimbursement of the providers under the [Medicaid] program." Md.Code (1990, 1992 Cum.Supp.) § 15–105(a) of the Health–Gen. Article. Pursuant to that authority, it has chosen to calculate a provider's "final per diem rate" "according to the principles established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and con-

tained in the Medicare Provider Reimbursement Manual, HCFA [2] Publication 15–1, unless otherwise specified by this chapter[.]" Md.Regs.Code tit. 10, § 09.11.08B(1) and § 09.-11.10B.

The federal regulations specifically address reimbursement in the "related organizations context." In 42 C.F.R. § 413.17, it is provided:

(a) *Principle.* Except as provided in paragraph (d) of this section, costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

(b) *Definitions*—(1) *Related to provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

(2) *Common ownership.* Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

(3) *Control.* Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.[3]

Section 413.153 provides, in pertinent part:

(a)(1) *Principle.* Necessary and proper interest on both current and capital indebtedness is an allowable cost.

\*      \*      \*      \*      \*      \*

---

**2.** Health Care Finance Administration ("HFCA").

**3.** Subsection (d) enumerates the circumstances under which what otherwise would be a related organization situation will not be

■■■■■■■■■■■■■■

(c) *Borrower—Lender relationship.* (1) Except as described in paragraph (c)(2) of this section, to be allowable, interest expense must be incurred or indebtedness established with lenders or lending organizations not related through control, ownership, or personal relationship to the borrower. Presence of any of these factors could affect the "bargaining" process that usually accompanies the making of a loan, and could thus be suggestive of an agreement on higher rates of interest or of unnecessary loans. Loans should be made under terms and conditions that a prudent borrower would make in armslength transactions with lending institutions. The intent of this provision is to assure that loans are legitimate and needed, and that the interest rate is reasonable. Thus, interest paid by the provider to partners, stockholders, or related organizations of the provider would not be allowable. If the owner uses his own funds in a business, it is reasonable to treat funds as invested funds or capital, rather than borrowed funds. Therefore, if interest on loans by partners, stockholders, or related organizations is disallowed as a cost solely because of the relationship factor, the principal of such loans is treated as invested funds in the computation of the provider's equity capital under § 413.-157.[4]

■■■ Section 413.134(g)(3), relating to cost basis upon purchase of a facility as an ongoing operation, provides:

(3) *Transaction other than bona fide.* If the purchaser cannot demonstrate that the sale was bona fide, in addition to the limitations specified in paragraph (g)(1) and (2) of this section, the purchaser's cost basis may not exceed the seller's cost basis, less accumulated depreciation.

-----

deemed to be such and provides that, in such a circumstance, charges of the supplier will be allowable at cost.

**4.** This regulation also defines when loans are not reasonably related to patient care. *See* 42 C.F.R. § 413.153(d).

Although this provision does not, in terms, refer to related organizations, the cases that have considered it have determined that a sale between related parties is not "bona fide". *See Hosp. Affiliates Int'l, Inc. v. Schweiker,* 543 F.Supp. 1380, 1389 (E.D.Tenn.1982); *Northwest Hosp., Inc. v. Hosp. Service Corp.,* 500 F.Supp. 1294, 1297 (N.D.Ill.1980); *South Boston Gen. Hosp. v. Blue Cross of Virginia,* 409 F.Supp. 1380, 1385 (W.D.Va.1976), *disapproved on other grounds, Pasadena Hosp. Assoc., Ltd. v. United States,* 618 F.2d 728, 223 Ct.Cl. 72 (1980).

Affirming the disallowance of the interest payment, the NHAB, by a two to one vote, ruled:

> The Board reviewed the written and oral arguments of both parties, and the majority of the Board agreed with the State that as the Provider purchased the land and building, utilized by the Provider from the late grandmother's estate, this transaction is between related parties and does not constitute a bonafide purchase. In other words there is no effective change in the ownership/operation which should be recognized for reimbursement purposes, therefore the loan obtained by Mr. Michael DeFontes is a refinancing.

> Further, COMAR Regulations states [sic] that "Refinancing not normally allowed will be permitted as the basis for reimbursement calculations if the Department determines that lower cost to the State would result", and the financing in question cannot result in lower cost in view of the fact that a $1,200,000 mortgage at 11% exists where prior to July 2, 1987, it did not exist, therefore its financing cannot be recognized for reimbursement purposes.

■ As the Court of Special Appeals noted, the NHAB, equated Liberty with DeFontes, referring only to the provider, when, in actuality, it was DeFontes, not Liberty, that purchased the facilities. The intermediate appellate court had "no problem" with DeFontes being referred to as the provider, however, since he owned 55 percent of Liberty

and, therefore, is "in effect, the 'Provider.'" [5] 91 Md.App. at 218, 603 A.2d at 1348. Neither party has questioned that holding; therefore, for purposes of the application of the Medicare regulations, we, too, shall assume that the facilities were purchased by the provider.

## III.

Judicial review of agency fact finding is narrow in scope and requires the exercise of a restrained and disciplined judicial judgment. *Supervisor v. Asbury Methodist Home*, 313 Md. 614, 626, 547 A.2d 190, 195 (1988). Where the agency's findings of fact are supported by substantial evidence, in the form either of direct proof or permissible inference, in the record before the agency, an appellate court may not substitute its judgment, even on the question of the appropriate inference to be drawn from the evidence, for that of the agency. Md.Code (1984) § 10–215(g) of the State Govt. Article.[6] *Bd. of County Comm'rs v. Holbrook,*

---

**5.** The dissenting Board member also appears to have adopted as his premise that DeFontes and Liberty are one and the same, rather than related persons. The dissent relied on *South Boston Gen. Hosp. v. Blue Cross of Virginia*, 409 F.Supp. 1380 (W.D.Va.1976), *disapproved on other grounds, Pasadena Hosp. Assoc., Ltd. v. United States*, 618 F.2d 728, 223 Ct.Cl. 72 (1980), in which the court held that the related organization rule applies only to ongoing relationships, such as a lease, not to sales, and that transactions between related organizations must be scrutinized to determine if it would have been reasonable had it been between unrelated parties. *Id.* at 1384. The dissent concluded that this transaction was clearly a patient related transaction, which resulted in savings to the State; the provider would have been required to pay more had a third party, to whom reasonable interest expenses would have to be paid, purchased the facility.

**6.** Maryland Code (1984) § 10–215(g) of the State Government Article provides, in pertinent part, that the circuit court may
    (1) remand the case for further proceedings;
    (2) affirm the decision of the agency; or
    (3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency:
    (i) is unconstitutional;
    (ii) exceeds the statutory authority or jurisdiction of the agency;
    (iii) results from an unlawful procedure;

314 Md. 210, 218, 550 A.2d 664, 668–69 (1988); *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 832, 490 A.2d 1296, 1300 (1985); *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 513, 390 A.2d 1119, 1124 (1978); *Snowden v. Mayor & City Council of Baltimore*, 224 Md. 443, 445, 168 A.2d 390, 391 (1961). Thus, if reasoning minds could reasonably reach the conclusion reached by the agency from the facts in the record, then it is based upon substantial evidence, and the court has no power to reject that conclusion. *Snowden*, 224 Md. at 448, 168 A.2d at 392. Moreover, the decision of an administrative agency carries with it a presumption of validity; consequently, judicial review is limited to determining whether a reasoning mind could have reached the factual conclusion reached by the agency. *Asbury Methodist Home*, 313 Md. at 626, 547 A.2d at 195.

■ When, however, the issue before the agency for resolution is one solely of law, ordinarily no deference is appropriate and the reviewing court may substitute its judgment for that of the agency. *Ramsay*, 302 Md. at 837, 490 A.2d at 1302. In that circumstance, the scope of review is much broader. *Caucus Distrib., Inc. v. Maryland Securities Comm'r*, 320 Md. 313, 324, 577 A.2d 783, 788 (1990); *Maryland State Police v. Lindsey*, 318 Md. 325, 334, 568 A.2d 29, 33 (1990); *State Election Bd. v. Billhimer*, 314 Md. 46, 58, 548 A.2d 819, 825 (1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989); *Washington Nat'l Arena v. Comptroller*, 308 Md. 370, 378–79, 519 A.2d 1277, 1281–82 (1987); *Ramsay*, 302 Md. at 836, 490 A.2d at 1300.

Having made the finding that Liberty and DeFontes are the same person for purposes of the facilities purchase, the Board purported to apply the applicable regulations to that

---

(iv) is affected by any other error of law;
(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted;  or
(vi) is arbitrary or capricious.

finding of fact. Our review is of the accuracy of its application of the law, not its fact finding.

## IV.

DeFontes is related to Liberty, both as a shareholder and as the lessor of the nursing home facilities. That relationship is by common ownership. *See* Provider Reimbursement Manual—I § 1002.2.[7] *See also Cuppett & Weeks Nursing Home, Inc. v. Dept. of Health and Mental Hygiene,* 49 Md.App. 199, 207, 430 A.2d 875, 879, *cert. denied,* 291 Md. 773 (1981). As his grandmother's heir, DeFontes is also related to her estate,[8] from whom he purchased the facilities. And when DeFontes leased the facilities to Liberty, that transaction was also between parties related by common ownership.

The NHAB and the Court of Special Appeals perceive the critical transaction to be DeFontes's purchase of the facilities from his grandmother's estate, rather than his

---

7.  The regulations speak of a relationship between related parties. The Provider Reimbursement Manual–I § 1002.1 defines "related to the provider" as "the provider to a significant extent is associated or affiliated with, or has control of, or is controlled by, the organization furnishing the services, facilities, or supplies." *See also* 42 C.F.R. § 413.17(b)(1). Section 1002.2 provides that common ownership exists "when an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider." *See also* 42 C.F.R. § 413.17(b)(2). Control exists "where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution." § 1002.3. *See also* 42 C.F.R. § 413.-17(b)(3).

8.  The Provider Reimbursement Manual–I § 1004 states that:
    The existence of an immediate family relationship will create an irrebuttable presumption of relatedness through control or attribution of ownership or equity interests.... The following persons are considered immediate family for Medicare program purposes: (1) husband and wife, (2) natural parent, child and sibling, (3) adopted child and adoptive parent, (4) step-parent, step-child, step-sister, and step-brother, (5) father-in-law, mother-in-law, sister-in-law, brother-in-law, son-in-law and daughter-in-law, (7) *grandparent and grandchild.* (emphasis added).

lease of those facilities to Liberty. Thus, having equated DeFontes with Liberty, *i.e.*, treated them as one and the same, for purposes of the Medicare regulations, the NHAB analyzed the transaction as a sale between the related organizations, Liberty and the Wessels estate.[9] This was the only way in which the analysis which the NHAB found dispositive could work.

The NHAB, as did the Court of Special Appeals, viewed 42 C.F.R. §§ 413.17, 413.130(g),[10] and 413.134(g)[11] as dispositive.

---

**9.** DeFontes's relationship to Liberty supplies the "relatedness" element insofar as Liberty and the estate is concerned. *See* Provider Reimbursement Manual—1 § 1001 and 42 C.F.R. § 413.17(b).

**10.** Currently 42 C.F.R. § 413.130(h), that section provides

(h) *Costs of supplying organizations—(1) Supplying organizations related to the provider.* (i) If the supplying organization is related to the provider within the meaning of § 413.17, except as provided in paragraph (g)(1)(ii) of this section, a provider's capital related costs include the capital—related costs of the supplying organization.

(ii) If the costs of the services, facilities or supplies being furnished exceed the open market price, or if the provisions of § 413.-17(d) apply, no part of the cost to the provider of the services, facilities, or supplies are considered capital-related costs, unless the services, facilities, or supplies would otherwise be considered capital-related.

**11.** Section 413.134(g) provides:

(g) *Establishment of cost basis on purchase of facility as an ongoing operation—(1) Assets acquired after July 1, 1966 and before August 1, 1970.* The cost basis for the assets of a facility purchased as a ongoing operation after July 1, 1966, and before August 1, 1970, is the lowest of the—

(i) Total price paid for the facility by the purchaser, as allocated to the individual assets of the facility;

(ii) Total fair market value of the facility at the time of the sale, as allocated to the individual assets; or

(iii) Combined fair market value of the individually identified assets at the time of the sale.

(2) *Assets acquired after July 31, 1970.* For depreciable assets acquired after July 31, 1970, in addition to the limitations specified in paragraph (g)(1) of this section, the cost basis of the depreciable assets may not exceed the current reproduction cost depreciated on a straight-line basis over the life of the assets to the time of the sale.

(3) *Transactions other than bona fide.* If the purchaser cannot demonstrate the sale was bona fide, in addition to the limitations

Liberty does not challenge the NHAB's fact finding; [12] it does not argue that, for purposes of the application of the Medicare regulations, Liberty and DeFontes are not the same person. It argues, instead, that § 413.153 is dispositive; by its terms, *i.e.*, subsection (a)(1), all interest payments not covered by an exception are reimbursable.

Section 413.153 is explicit, "Necessary and proper interest on both current and capital indebtedness is an allowable cost." § 413.153(a). Interest, as defined in subsection (b), recognizes that "[i]nterest on capital indebtedness is the cost incurred for funds borrowed for capital purposes, such as acquisition of facilities and equipment, and capital improvements." Subsection (b)(2) addresses when interest is necessary. Subsection (b)(2)(ii) provides that interest is necessary when it is "[i]ncurred on a loan made for a purpose reasonably related to patient care." Since interest may be paid on capital indebtedness, which includes indebtedness incurred for the acquisition of facilities, by implication, interest may be reimbursable, as reasonably related to patient care, when paid on a loan incurred for the acquisition of facilities. Interest is proper when it is "[i]ncurred at a rate not in excess of what a prudent borrower would have had to pay in the money market existing at the time the loan was made" and it is not paid to a related lender. Subsection (b)(3)(i) and (ii).

---

specified in paragraph (g)(1) and (2) of this section, the purchaser's cost basis may not exceed the seller's cost basis, less accumulated depreciation.

12. The Medicare regulations, however, address, and control, transactions by, and affecting the provider, *i.e.*, the provider of services, as "a hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency...." *See* 42 U.S.C. § 1395x(b) (1985). Transactions between related parties even those who are related to the provider and even when those transactions may ultimately impact the provider, are not within the purview of the NHAB to regulate. In this case, the provider is Liberty, not DeFontes. DeFontes, having purchased the facilities from a related party, his grandmother's estate, has merely provided Liberty with the wherewithal to operate the nursing home.

Subsection (c) sets forth the purpose of § 413.153: "[T]o assure that loans are legitimate and are needed, and that the interest rate is reasonable." It has been described as a "blanket disallowance" of related-party interest, *Northwest Hosp., Inc. v. Hosp. Service Corp,* 687 F.2d 985, 995 (7th Cir.1982) and upheld as a valid prophylactic measure. *Mourning v. Family Publications Services, Inc.,* 411 U.S. 356, 372–73, 93 S.Ct. 1652, 1662, 36 L.Ed.2d 318, 331 (1973); *Goleta Valley Community Hosp. v. Schweiker,* 647 F.2d 894, 897 (9th Cir.1981). Subsection (c) provides quite clearly, that "to be allowable, interest expense must be incurred on indebtedness established with lenders or lending organizations not related through control, ownership, or personal relationship to a borrower," and, conversely, that "interest paid by the provider to partners, stockholders, or related organizations of the provider would not be allowable." *See Univ. of Cincinnati v. Heckler,* 733 F.2d 1171, 1174 (6th Cir.1984); *Northwest Hosp.,* 687 F.2d at 989.

Contrary to the respondent's contentions and the focus of the intermediate appellate court's opinion, for § 413.153 purposes, the relevant transaction is the loan transaction, not the transaction giving rise to it. Therefore, the critical relationship is that of lender to borrower, not seller to purchaser (except when all parties are the same):

> The regulation denies interest not so much because of the nature of the transaction for which the loan is obtained but because of the source of the loan. Section 405.419(c) [current § 413.153(c)] is not as concerned that the *sale* was between related parties (except to the extent that the necessity of such a sale, and hence of the loan to pay for it, is in doubt) as it is that the *loan* was between related parties. Thus, even if the sale had been between strangers, § 405.419(c) would operate so long as the loan to pay for it came from a related entity. The Secretary considers it more likely that, when a loan is made between unrelated parties bargaining at arms length, the interest rate will prove reasonable and the loan itself necessary.

*Jackson Park Hosp. Found. v. United States,* 659 F.2d 132, 138, 228 Ct.Cl. 448 (1981). *See also Heckler,* 733 F.2d at 1174.

This was recognized, *albeit* more by implication than explicitly, in *Shaker Medical Center Hosp. v. Secretary of Health and Human Serv.,* 686 F.2d 1203 (6th Cir.1982). There, a single physician controlled both the hospital and the real estate company from whom the hospital leased the building in which it operated. At the physician's advice—he was also the hospital's board chairman—the hospital purchased the hospital building from the real estate company at a substantially inflated price. The purchase was financed by both commercial loans, *i.e.,* $700,000.00, at nine and ten percent interest, and a loan from the physician, *i.e.,* a $400,000.00 note at seven percent interest. The Secretary allowed reimbursement of the interest paid on the commercial loans, but disallowed it on the physician's note. The court affirmed, holding, "[T]he Secretary was justified in disallowing reimbursement for the interest paid [to the physician], since under 42 C.F.R. § 405.419 it was paid to a related entity...." *Id.* at 1208. Significantly, the allowance of interest on the commercial loans was not questioned. Similarly, in *Stevens Park Osteopathic Hosp. Inc. v. United States,* 633 F.2d 1373, 1375, 225 Ct.Cl. 113 (1980), interest payments on notes financing the purchase of a hospital building from a former stockholder were disallowed, while interest paid on a first lien deed of trust to a non-related lending institution was allowed. *See also Northwest Hosp.,* 687 F.2d at 993 ("commercial interest expense [through a commercial lender] clearly qualifies as a reimbursable Medicare cost"); *South Boston,* 409 F.Supp. at 1385 ("A financing arrangement through a commercial lender might have been just as satisfactory.... Such an arrangement would have avoided consideration of the related parties doctrine....").

The purpose underlying § 413.153(c) is more important than the nature of the loan transaction. When the purpose is not otherwise contravened, *i.e.,* the loan is legitimate and

needed and the interest rate is reasonable, interest expense on a loan between related parties has been allowed. In *Northwest Hospital,* payment of interest on a loan from former stockholders to permit a new corporation to purchase their stock was reimbursable notwithstanding § 417.-153, where the loan was clearly needed to complete the transaction and the interest rate was reasonable. The court reasoned:

> In sum, to finance a sale consistent with the purposes of the Medicare program, funds must be supplied from some source. The supplying of such funds inescapably makes a cost (interest). It is entirely possible, particularly where loan funds are scarce, that the *only* available source of funds will be the sellers (who are related parties). In such a case it would be egregiously unjust, as well as contrary to the Medicare statute, to disallow this inescapable interest cost. Even where other sources of funds can be found, moreover, the commercial rate of interest payable on those funds is likely to be considerably higher than the rate payable to a related-party seller. It is unreasonable as well as economically inefficient to force nonprofit hospitals to incur these higher (but unquestionably reimbursable) costs merely because *no* interest paid to a related party may be reimbursed. Hence, the application of the challenged regulation to the facts of the instant case is unreasonable and invalid.

687 F.2d at 995–96. *See also Trustees of Indiana Univ. v. United States,* 618 F.2d 736, 739–40, 223 Ct.Cl. 88 (1980) (where neither party would earn a profit from the transaction and there was no reason to believe the transaction was unnecessary or improper, that the parties were related did not bar reimbursement of interest on loans from Indiana University to its related organization, Indiana University Hospital); *South Boston,* 409 F.Supp. at 1383–84 (regulation directed towards self-dealing between related providers of Medicare services was not applicable to a transaction in which a provider purchased facilities of a related provider

where there was no ongoing relationship between the related providers).

It is not contended that the First American Bank, the lender, and Liberty, the borrower, were related or that the transaction was other than at arms length. It is likewise agreed that the interest rate was reasonable and the price paid for the facilities was in line with, and in fact, was less than, their appraised value for Medicaid purposes. There simply is no impediment, on these grounds, to the application of § 413.153 to the case *sub judice*.

## V.

The respondent argues that § 413.153 requires, as a condition precedent to reimbursement, that the interest expense be necessary.[13] In the case *sub judice*, the loan was made for the purpose of acquiring a facility to operate a nursing home. It was, therefore, a capital loan and the interest incurred was interest on capital indebtedness.

Interest is necessary if it is incurred on a loan made to satisfy a financial need of the provider or for a purpose reasonably related to patient care. § 413.153(b)(1). The respondent asserts that Liberty, the provider, "had no financial need to purchase the building and property and, as a matter of fact, it did not." Respondent's brief at 22. It points out that DeFontes purchased the facilities in his individual capacity in order to raise money to pay estate taxes, for which Liberty was not liable. It also contends that payment of estate taxes for DeFontes's grandmother's estate was not related to patient care in any way and, indeed, was simply motivated by DeFontes's desire to maximize his inheritance. The respondent also relies on § 413.-153(d)(1)(i)(B), arguing that it precludes "the purchase of a

---

**13.** The regulation also requires the interest expense to be proper. In this case, there is no contention that the interest actually paid is improper, it is agreed by the parties that the eleven percent interest is a commercially reasonable rate.

facility by a related organization from being considered to be for a purpose reasonably related to patient care." [14]

At the outset, we note that neither of these arguments was a basis for the NHAB's decision. *See United Steelworkers v. Bethlehem Steel Corp.*, 298 Md. 665, 679, 472 A.2d 62, 69 (1984). Moreover, it should be pointed out that the only finding, relevant to this issue, made by the Board was that Liberty and DeFontes should be considered one person for purposes of the purchase of the facilities. This means that that purchase, an action undertaken by DeFontes, individually, should be attributed to Liberty. But it is only the purchase that is attributed to Liberty. Liberty and DeFontes were not found by the Board, and indeed, they could not have been, to be identical or to have an identity of interest beyond that fact. DeFontes's reason for purchasing the facilities, or for authorizing their sale on behalf of the estate, was not, and could not have been attributed to Liberty. Thus, while Liberty and DeFontes may be identical, as the Board found, for purposes of determining the parties to the purchase of the facilities, and the effect of the purchase, their motives are not. What those motives were must be analyzed separately and from the appropriate perspective.

That an individual, who is equated with the provider, purchased the facilities for a specific purpose or to achieve a specific result, does not answer the question whether,

---

**14.** Section 413.153(d)(1)(i)(B) provides:

> (d) *Loans not reasonably related to patient care* (1) The following types of loans are not considered to be for a purpose reasonably related to patient care:
> (i) For loans made to finance acquisition of a facility, the portion of the cost that exceeds—
> (B) The cost basis as determined under § 413.134(g). . . .

This provision only precludes that portion of a loan, made to finance acquisition of a facility, that exceeds the cost basis of the facility, as determined under § 413.134(g), from being so considered, not the entire loan. There is no evidence in the record as to what the cost basis of the facilities was. Without that information, the Board could not have determined what, if any, portion of the loan and, hence, of the interest expense, should be disallowed pursuant to § 413.134(h).

from the provider's perspective, the purchase was necessary. Whether the purchase was necessary, or not, is a matter of fact to be determined by the administrative agency, from the provider's perspective and in light of the prevailing circumstances.

■ In this case, the need to pay estate taxes rendered the sale of the facilities virtually inevitable, but without any guarantee of their continued lease to Liberty. Insuring that those facilities, which were necessary to Liberty's continued operation were retained for its use could be found by the Board to be a sufficient reason for Liberty to have purchased the facilities and, hence, for finding the purchase necessary.

From Liberty's perspective, then, the purpose of obtaining the loan and, thus, of incurring the interest expense, was to acquire the facilities for its continued operation. On the other hand, the estate's reason for selling the facilities—it was on behalf of the personal representative of the estate that DeFontes made the decision to sell the facilities—was to acquire sufficient funds with which to pay estate taxes. Not even the NHAB has found the estate and Liberty to be the same entity. Therefore, that the sale may have been motivated by the need to obtain funds to pay estate taxes is, for our purposes, irrelevant. Conceding that payment of the estate taxes does not relate to patient care, the essential question still remains—whether Liberty's acquisition of the facilities related to patient care. As indicated, that is a factual issue, which the administrative agency must determine in the first instance, *see State Comm'n on Human Relations v. Malakoff,* 273 Md. 214, 224, 329 A.2d 8, 14 (1974), something that was not done in this case.

Nor does it matter that DeFontes's motive for buying the facilities may have been entirely selfish, having no intent to benefit Liberty. Again, it is the effect of the purchase, from Liberty's perspective, that controls. Consequently, DeFontes's motive, assuming there is, on this record, proof

of it, is totally irrelevant. Certainly nothing in § 413.153, or the policy underlying it, prohibits allowing the reimbursement under the facts of this case.

## VI.

The Court of Special Appeals determined that §§ 413.17, 413.130(g), 413.134(g),[15] and specifically their related organizations provisions, rather than § 413.153, are applicable to, and dispositive of, this case. These regulations address neither a lender/borrower relationship, nor whether interest expenses are reimbursable. Section 413.17 pertains to the costs, applicable to services, facilities and supplies furnished by related organizations, includable in the allowable costs of the provider. By limiting the allowable costs to the cost to the related organization, that section seeks to protect public funds from abuses resulting from self-dealing or bad faith dealing between related organizations. *Jackson Park*, 659 F.2d at 136; *Northwest Community Hosp., Inc. v. Califano*, 442 F.Supp. 949, 952 (S.D.Iowa.1977); Annotation, *What is Related Organization within Meaning of 42 C.F.R. § 405.427*[16], *Limiting Reimbursement Of Cost Of Services, Facilities, or Supplies Furnished To Medicare Provider By Such Organization*, 63 A.L.R.Fed. 486 (1983). There is no evidence, nor any allegation, of such dealings in this case. It bears on the depreciation allowance to the provider, one of the two elements of reimbursable costs created by a sale of the facility. *See Heckler*, 733 F.2d at 1180; *Jackson Park*, 659 F.2d at 135. Contrary to Liberty's argument, § 413.17 is sufficiently broad to encompass a sale of facilities between a provider and a related organization—it does not simply address the situation where goods, services and leases are the subject of a transaction. *See* Provider Reimbursement Manual—1 § 1011.4; *Shaker Medical*, 686 F.2d at 1208; *Goleta Valley*, 647 F.2d at 897;

---

**15.** Current § 413.130(h).

**16.** Current 42 C.F.R. § 413.17.

*Hillside Community Hosp. of Ukiah v. Mathews,* 423 F.Supp. 1168, 1175 (N.D.Cal.1976). That fact is not fatal to Liberty's argument. In this case, Liberty only seeks reimbursement for an interest expense, not for depreciation. In Maryland, in point of fact, depreciation is not a reimbursable expense; Maryland reimburses through net capital value rental. *See* Md.Regs.Code tit. 10 § 09.11.10L.

Section 413.130(g) pertains to the computation of a provider's capital-related costs when capital-related services, facilities, or supplies are supplied by a related organization. Section 413.134(g) addresses the cost basis, to the provider, of a facility, purchased as an ongoing operation, but whose purchase cannot be demonstrated to be bona fide. Provider Reimbursement Manual—1 § 1011.4 makes clear that these regulations are concerned with the purchaser's basis for depreciation:

> Where a facility is purchased from an organization related to the purchaser by common ownership or control, or where a facility, through purchase, converts from a proprietary to a nonprofit status and the buyer and seller entities are related by common ownership or control, the purchaser's basis for depreciation shall not exceed the seller's basis under the program ... less accumulated depreciation recognized under the program.

Noting that Medicare and Medicaid do not reimburse providers in amounts greater than the costs to their related party sellers, *see Fallston Gen. Hosp. v. Harris,* 481 F.Supp. 1066, 1070 (D.Md.1979), the respondent argues that when there is no outstanding mortgage on the facilities at the time that they were sold to a related party, the seller's cost basis as well as capital-related costs are zero. Noting that the related organization rules do not permit an increase in costs, including increased mortgage interest costs to finance the sale, the respondent asserts that the interest expense incurred by the related party purchaser in connection with the loan to acquire the facilities must be disallowed. In other words, the respondent equates cost basis and capital-related costs to the existence of an outstanding

mortgage and any interest payments in respect thereto. Liberty is not seeking reimbursement, as a provider, for any payments made to, or in respect of, its related party seller. It is not attempting to boost the cost basis for the facilities or to obtain reimbursement for depreciation. It seeks only to be reimbursed for an interest expense paid to an unrelated organization. Moreover, application of § 413.-134(g) does not require the existence of a mortgage and debt service. Furthermore, to read § 413.130(g) as the respondent does is to render § 413.153, as it pertains to loans from unrelated parties to finance related party purchases, completely superfluous. That section, as we have seen, contemplates that capital related interest be reimbursed so long as it is not paid to a related party. § 413.-153(b) and (c). Sections 413.17, 413.30(g), and 413.134(g) are more appropriately interpreted to refer to costs and capital-related costs as they pertain to depreciation, rather than interest.[17]

The NHAB also determined that the purchase of the facilities contravened COMAR 10.09.11.10N and, thus, could not be recognized for reimbursement purposes. That section provides that "[r]efinancing not normally allowed would be permitted as the basis for reimbursement calculations if the department determines that a lower cost to the estate would result." The Board noted that, because no mortgage, in any amount, was outstanding prior to the provider's purchase of the facilities, its financing of that purchase could not result in a lower cost to the estate.

COMAR 10.09.11.10N regulates the calculation of the provider's reimbursement rate. As such, the reference to

---

17. As we have seen, § 413.153 also contains a related parties provision, the purpose of which is to prevent self-dealing between related parties. It differs, however, from the related parties provision in § 413.17, which is also applicable to §§ 413.130(g) and 413.134(g) in that the latter provision disallows a stepped up basis for depreciation purposes between related parties and the former disallows interest payments between a related lender and borrower. *See Northwest Hosp.*, 687 F.2d at 994.

"refinancing" logically refers to the substitution of new debt for preexisting debt. In the case *sub judice,* the provider had no debt with respect to the facilities—it was leasing them from the estate—prior to its purchase of them. Thus, the provider's loan from First American *financed,* as opposed to refinanced, the purchase. That does not fall within the regulations. To read the regulations as the respondent does is to give the term "refinancing" a meaning different from its usual meaning. We have said, that, in construing statutes, words are to be given their natural and usual meaning, *Harford County v. Univ. of Maryland,* 318 Md. 525, 529, 569 A.2d 649, 651 (1990), without resorting to strained, subtle, or forced interpretations or giving a word a meaning not otherwise evident by the context in which it is used, *State v. Patrick A.,* 312 Md. 482, 487, 540 A.2d 810, 812 (1988); *Bridges v. Nicely,* 304 Md. 1, 10, 497 A.2d 142, 147 (1985); *Bd. of Educ. of Garrett County v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185, 1189 (1982); *Schmidt v. Beneficial Finance Co.,* 285 Md. 148, 155, 400 A.2d 1124, 1128 (1979); *Police Comm'r v. Dowling,* 281 Md. 412, 419, 379 A.2d 1007, 1011 (1977), for the purpose of extending or limiting the operation of the statute. *Dickerson v. State,* 324 Md. 163, 171, 596 A.2d 648, 652 (1991); *Mayor & City Council of Baltimore v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984).

## VII.

The present case does not present a proper situation in which to disallow interest payments based upon the "related party" provisions. As the court said in *Jackson Park,* 659 F.2d at 138, "[section 413.153(c)] is not concerned that the *sale* was between related parties ... as it is that the *loan* was between related parties."

JUDGMENT REVERSED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REMAND TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER REMAND TO THE NURSING HOME REVIEW BOARD FOR FURTHER PROCEED-

INGS NOT INCONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.