**GOOD SAMARITAN HOSPITAL,**
Plaintiff,

v.

**Donna SHALALA, Defendant.**

No. C-1-93-886.

United States District Court,
S.D. Ohio,
Western Division.

Dec. 19, 1994.

Diane Marie Signoracci, Bricker & Eckler, Columbus, OH, for Good Samaritan Hosp.

Donetta Donaldson Wiethe, U.S. Dept. of Justice, Cincinnati, OH, for Department of Health and Human Services.

## *ORDER*

CARL B. RUBIN, District Judge.

This matter is before the Court upon cross-motions for summary judgment. (Docs. 7 and 9). In accordance with Fed. R.Civ.P. 52, the Court sets forth below its Findings of Fact, Opinion, and Conclusions of Law.

### I.  *Findings of Fact*

1.  Plaintiff, Good Samaritan Hospital, is a non-profit hospital that participates in the Medicare program.

2. Defendant, Donna Shalala, is the Secretary of the United States Department of Health and Human Services.

3. The Medicare program provides health insurance for the aged and disabled for certain medical services rendered by participating hospitals.

4. The Secretary, through fiscal intermediaries, reimburses participating providers for medical services covered under the Medicare program. The fiscal intermediary for Plaintiff during the years in issue was Blue Cross and Blue Shield Association/Community Mutual Insurance Co.

5. Prior to the federal fiscal year 1984, the Medicare program reimbursed acute care hospitals on the basis of their reasonable costs. At the start of the fiscal year 1984, Medicare began phasing in a prospective payment system (PPS). Under the PPS, a hospital is reimbursed through a single payment for inpatient operating costs for each type of inpatient admission based upon the diagnosis-related group into which the care is classified.

6. The PPS was phased in over a four-year period. For each year during the PPS transition period, a progressively declining portion of Medicare reimbursement was based on a prospective payment rate derived from the specific hospital's historical costs in a given base year, and a gradually increasing portion was based on a regional and/or national rate per discharge. The base year for Plaintiff was the twelve-month period ending on June 30, 1983.

7. For the fiscal year 1985, Plaintiff was subject to the PPS for the first time. During that year, Plaintiff's reimbursement for inpatient operating costs was based in part on a hospital-specific rate and in part on the national rate.

8. Plaintiff operates a Medicare-approved graduate medical educational program for interns and residents (the "GME Program"). Teaching physicians, non-physician faculty, and support personnel are involved in the program. During fiscal year 1985, payments for medical education costs were made on a reasonable cost basis and were considered "pass-through" costs.

9. For the cost reporting period in issue, the regulations governing the PPS included a "consistency rule" codified at 42 C.F.R. § 405.477(c)(2). The rule provided as follows:

> For cost reporting periods beginning prior to October 1, 1986, the costs of medical education must be determined consistently with the treatment of such costs for purposes of determining the hospital-specific portion of the transition payment rate in § 405.474 [subpart E, redesignated 42 C.F.R. 412.70, et. seq.] (1984).

The rule was later qualified to read, "Except as provided in 413.86(c)(1) of this chapter, for cost reporting periods ..."

10. On March 25, 1985, the fiscal intermediary issued a bulletin advising hospitals to maintain certain data and information to support claimed expenses for hospital-based physician compensation.

11. In Plaintiff's cost report for both the PPS base year and the fiscal year 1985, Plaintiff claimed as GME costs 100% of the compensation paid to teaching physicians assigned to Plaintiff's Medical Education Department. Plaintiff submitted supporting documentation consistent with the requirements of the March 1985 Bulletin. In the initial audit for that year, the fiscal intermediary allowed the claimed costs on a pass-through basis and excluded them from operating costs.

12. In 1986, Congress passed Pub.L. No. 99–272, Title IX, §§ 9202(a), et seq., 100 Stat. 171–175 et seq., 42 U.S.C. § 1395ww(h). The statute required the Secretary to determine the average amount recognized as reasonable under Medicare for hospitals' direct GME costs for each full-time-equivalent (FTE) resident beginning with hospital cost reporting periods that commenced during federal fiscal year 1984 (the GME base year). Pursuant to the statutory directive, in 1989 the Secretary promulgated a new regulation codified at 42 C.F.R. § 413.86. Section 413.86 expressly exempts GME costs for certain years from the consistency rule. It provides that beginning with cost reporting periods starting on or after July 1, 1985, hospitals will be paid a per resident amount determined on the basis

of allowable GME costs for the cost reporting period beginning on or after October 1, 1983 but before October 1, 1984. The per resident amount for each hospital is to be calculated by dividing the amount of base year GME costs recognized as reasonable by the number of FTE residents and interns working at the hospital during the base year. For 1985 and future years, the base period per resident amount would be multiplied by the number of FTE residents working in the hospital during the year in question, and that figure in turn would be multiplied by the hospital's Medicare patient load in the same year. Fiscal year 1985 serves as Plaintiff's base year for determining direct GME payments for future cost years.

13. Section 413.86(e) authorizes fiscal intermediaries to reaudit the base year and exclude any nonallowable or misclassified costs from the determination of the per resident amount. Section 413.86(e) further provides that if the hospital's cost report for its GME base period is no longer subject to reopening under § 405.1885, the intermediary may modify the hospital's base-period costs solely for purposes of computing the per resident amount. Section 413.86(j) provides that if the intermediary determines that the hospital-specific rate should be adjusted, the adjustment is effective for the hospital's cost reporting periods subject both to the PPS and to reopening under § 405.1885.

14. In 1990, the fiscal intermediary for Plaintiff commenced a reaudit of the hospital's fiscal year 1985 GME costs for the dual purpose of determining the GME base year per resident amount and to adjust the level of reimbursement of GME costs for that fiscal year. The reaudit led to a reclassification of $284,919 in GME personnel costs from GME costs to operating costs. The reclassification resulted in a $313,558 reduction of Plaintiff's Medicare reimbursement for the fiscal year 1985.

15. Plaintiff operates a Clinical Support Laboratory as part of its GME program. For fiscal year 1985, Plaintiff claimed as reimbursable GME costs the compensation paid to staff in connection with operating the laboratory. The fiscal intermediary made no adjustments during the initial audit. As a result of the reaudit, costs for operating the laboratory were denied, resulting in a reimbursement reduction of approximately $87,803.

16. Plaintiff appealed the reclassification of GME costs and disallowance of the laboratory costs to the Provider Reimbursement Review Board (the Board) pursuant to 42 U.S.C. § 1395oo. The Board reversed the fiscal intermediary's decision as to the former and affirmed as to the latter. Upon a review of the Board's decision, the Administrator of the Health Care Financing Administration of the U.S. Department of Health and Human Services (Administrator) reversed the Board's decision as to teaching physicians, but affirmed as to non-physician faculty and support personnel costs and laboratory costs.

## II. *Opinion*

### A. *Standard of Review*

■ In an action for judicial review brought under the Administrative Procedure Act, a court may set aside an agency action that is either (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or (2) unsupported by substantial evidence. 5 U.S.C. § 706(2)(A). Under the arbitrary and capricious standard, the court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Motor Vehicle Mfrs. Asn. v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (*citing Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974)). The standard of review is narrow. "The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

■ Under the substantial evidence standard, the evidence relied upon by the agency in reaching its determination must be "something more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a con-

clusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). The court is to consider only the bases upon which the agency actually relied in reaching its decision. *Volpe,* 401 U.S. at 420, 91 S.Ct. at 825–26.

In reviewing an agency's construction of a statute, the court must ascertain (1) whether Congress has directly spoken to the precise issue before the court and, if not, (2) whether the agency's determination of the issue is a reasonable one. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Thomas Jefferson University v. Shalala,* —— U.S. ——, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Jewish Hospital v. Secretary of Health and Human Services,* 19 F.3d 270, 273 (6th Cir. 1994). The court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of the agency. *State of Ohio v. Dept. of Health and Human Services,* 761 F.2d 1187 (6th Cir.1985). If the administrator's interpretation is reasonable, the court must uphold it even if the court would have reached a different interpretation had that issue first been presented to it. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). However, the court must reject administrative constructions which are inconsistent with a statutory mandate or which frustrate congressional policy. *F.E.C. v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 31, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981).

An agency's interpretation of its own regulations is entitled to considerable deference. *Udall,* 380 U.S. 1, 85 S.Ct. 792; *Shaker Medical Center Hospital v. Secretary of Health and Human Services,* 686 F.2d 1203, 1208 (6th Cir.1982); *S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). The court must give that interpretation controlling weight unless it is "plainly erroneous or inconsistent with the regulation". *Thomas Jefferson,* —— U.S. at ——, 114 S.Ct. at 2386. In making this determination, the court looks to the plain language of the regulation or other indications of the Secretary's intent at the time of the regulation's promulgation. *Id.* at ——, 114 S.Ct. at 2386–87.

## B. *Plaintiff's Claims*

Plaintiff contends that the fiscal intermediary's decision was erroneous in the following respects: (1) Reclassification of compensation paid to teaching physicians from GME to operating costs violates the Medicare consistency rule embodied in 42 C.F.R. 412.113(b); (2) The finding of the fiscal intermediary and Administrator that Plaintiff had failed to submit sufficiently verifiable time allocation records to justify full reimbursement of its fiscal year 1985 teaching physician compensation costs was arbitrary and irrational; and (3) The fiscal intermediary erred in reclassifying the costs of the clinical support laboratory from GME costs to a non-reimbursable cost center. Plaintiff claims that the fiscal intermediary's reclassification and disallowance of GME costs violates the Medicare prohibition against shifting necessary costs of providing services from Medicare beneficiaries to non-Medicare beneficiaries.

## C. *Reclassification of Costs of Compensation Paid to Physician Faculty Members*

With regard to the reclassification of Plaintiff's claimed GME costs for fiscal year 1985, the Administrator determined that § 413.86 modified the consistency rule to allow the recalculation of the hospital-specific rate to account for misclassified costs. The consistency rule requires that during the transition period, costs must be treated in the same manner as they were treated during the base year; that is, the allowable costs involved in setting the hospital rate should be recognized consistently as either GME costs or operating costs throughout the PPS transition period. 54 Fed.Reg. at 40289 (Sept. 29, 1989). The Administrator based his determination concerning the consistency rule on the following analysis: Section 413.86 instructed intermediaries to reopen and reaudit a hospital's 1984 base-year GME costs, if necessary, to exclude any nonallowable or misclassified costs. If the base-period cost report was no longer subject to reopening

under 42 C.F.R. § 405.1885 [1], § 413.86 authorized the intermediary to modify the hospital's costs solely for purposes of computing the per resident amount, but not to adjust the amount owed under the 1984 Notice of Program Reimbursement (NPR). However, if the reopening was within the three-year period provided in § 405.1885, the reaudit could result in the recoupment of Medicare reimbursement for the 1984 cost year. In this case, since the 1984 base year (the fiscal year ending June 30, 1985) was reopened within three years of the intermediary's final settlement, any modification of base year amounts was not limited solely to calculating the per resident amount, but could also include recoupment of Medicare reimbursement.

The Administrator found this interpretation to be in conformity with § 412.113, which provides that an exception is allowed under § 413.86(j).[2] Subsection (j) permits a hospital that has had its base period GME costs reduced under subsection § 413.86(e)(1) because those costs included misclassified operating costs to request that the intermediary review the classification of the affected costs. The Administrator found that the consistency rule therefore recognizes the limited authority to modify the PPS base year for the purpose of determining the hospital-specific rate under § 413.86(j) when costs are determined to have been improperly classified in the GME base year as GME costs rather than as operating costs. Accordingly, the Administrator determined that when the consistency rule is read in conjunction with § 405.1885 and § 413.86, it does not preclude the reclassification of costs from GME costs to operating costs in this case.

Plaintiff contends that whether or not the reopening was timely pursuant to § 405.1885,

the consistency rule precludes reclassification of physician faculty compensation costs for the PPS transition period. Plaintiff further alleges § 413.86(c) does not apply to the cost reporting period in issue because that period started before July 1, 1985 and § 413.86, by its terms, applies to cost report periods beginning on or after that date. Finally, Plaintiff contends that once the hospital-specific amount was determined, adjustments were limited to those identified in § 412.72, formerly § 405.474.[3]

■ The first issue before the court is whether the Secretary had the authority to recoup GME costs paid during the hospital's base year. Congress has not spoken to this precise issue, and the court has not been directed to any sources indicating that Congress intended to preclude the Secretary from recouping payments for costs erroneously classified during the base period. Thus, the question to be resolved is whether the Secretary interpreted and applied her own regulations promulgated in accordance with the legislative changes in a manner that was arbitrary, capricious, or otherwise not in accordance with law, or unsupported by substantial evidence.

The court finds that the Secretary's interpretation of her own regulations is reasonable and must stand. The fiscal intermediary had the authority to reopen the fiscal year 1985 cost report pursuant to § 405.1885, which permits reopening of a cost report within three years of the intermediary's issuance of an NPR. The NPR was issued on February 28, 1986. The intermediary reopened the cost report on January 20, 1989. Thus, reopening was apparently timely and was authorized under § 405.1885.[4]

---

1. Section 405.1885 allows a fiscal intermediary to reopen a determination within three years of the date of the notice of the determination.

2. As explained by the Administrator, while the final rule indicates that the exception is provided in § 413.86(c)(1), there is in fact no § 413.86(c)(1). Instead, the proposed changes to the rule referred to exceptions contained in subsection (j) and the proposed rule was adopted unchanged. Plaintiff does not dispute the Administrator's findings on this point.

3. Section 412.72 provides for modification based on inadvertent omissions, mathematical errors, a successful provider appeal, or unlawfully claimed costs.

4. The court notes that the Secretary has stated that even if § 1886(h) had never been enacted, fiscal intermediaries would have had the authority to reopen cost reports pursuant to § 405.1855 for the purpose of correcting erroneous reimbursement amounts for direct medical education pass-through costs. 54 Fed.Regis. at 40301.

Further, the reopening was permissible under § 413.86. Although § 413.86, by its express terms, applies to cost reporting periods starting on or after July 1, 1985, it also provides the method for calculating costs for base years which began on or after October 1, 1983 and before October 1, 1984. The regulation permits the intermediary in performing the calculation to exclude any nonallowable or misclassified costs, including those previously allowed under the consistency rule. See § 413.86(e)(1)(ii)(B). Thus, the fiscal intermediary was authorized under § 413.86 to reclassify GME costs for the fiscal year in issue, which began between October 1, 1983 and October 1, 1984.

In addition, the court finds that the Secretary could reasonably interpret the regulations as permitting not only the adjustment of misclassified medical education costs, but also the recoupment of such costs. The wording of § 413.86 supports the proposition that if the base period is subject to reopening under § 405.1885, the intermediary is not limited to excluding nonallowable or misclassified base period costs *solely* for purposes of computing the per-resident amount, but may also recoup such costs. Section 413.86 specifies that if a base period falls outside the three-year period for reopening, the base period costs may be modified solely for purposes of computing the per resident amount. If recoupment of GME costs were prohibited for years subject to reopening under § 405.1885, there would be no need for § 413.86 to include this qualification. Thus, there is ample support for the Secretary's conclusion that § 413.86 allows the intermediary to reopen and reaudit a base year, to modify the base period costs to exclude misclassified or nonallowable costs, and to recoup any payments made as a result of the misclassification for years subject to reopening under § 405.1885.

■ Plaintiff nonetheless contends that the Secretary's conclusion must be invalidated because it conflicts with the consistency rule promulgated by the Secretary. The court disagrees and finds that the Administrator could reasonably conclude that the consistency rule did not preclude the reclassification and recoupment of erroneously classified GME costs for base years falling within the ambit of § 413.86. The consistency rule was enacted in order to avoid reimbursing a hospital for the same costs more than once by including the costs in both the hospital-specific rate as base year costs and then again as pass-through costs if the classification of such costs changed during the transition period. 53 Fed.Regis. at 38517 (1988). The rule was never intended to prohibit the rectification of errors in cost classification or to prevent the Secretary from recouping operating costs erroneously classified as GME costs. 54 Fed.Reg. at 40302 (1989). Rather, the rule was intended to *minimize* the reclassification of costs during the PPS transition period, 53 Fed.Regis. at 38517 (1988). Accordingly, the Secretary's decision that the fiscal intermediary was permitted to reaudit and recoup erroneously classified costs for Plaintiff's fiscal year 1985 is based on a permissible construction of the governing regulations and must stand.

The next issue for the court's consideration is whether the reclassification of faculty physician compensation from GME costs to operating costs was proper. Several regulations are pertinent to resolution of this issue. Title 42 U.S.C. § 413.85 provides that for cost reporting periods beginning before July 1, 1985, a provider's allowable costs may include its net cost of approved educational activities. Subsection (d) lists activities that are not within the scope of the rule but are recognized as normal operating costs. The listed activities include activities that do not involve the actual operation of an approved education program. Subsection (g) provides that the total costs of approved educational activities include "trainee stipends, compensation of teachers, and other direct and indirect costs of the activities as determined under the Medicare cost-finding principles in § 413.24". Section 413.24 requires providers to supply adequate cost data which must be sufficiently detailed to accomplish the purpose for which it is intended. Section 413.20 requires providers to maintain sufficient financial records and statistical data which must be capable of verification by qualified auditors for the proper determination of costs under the program.

The March 25, 1985 Reimbursement Bulletin regarding allocation of teaching physician time issued by the fiscal intermediary was based on the above regulations. Attached as Exhibit A to the Bulletin is a physician compensation allocation form. The form subdivides physician compensation into the following three categories: physician services to the provider ("Part A"); physician services to patients ("Part B"); and non-reimbursable activities ("Part C"). Part A activities are further subdivided into several subcategories, specifically utilization review and other committee work, administration, supervision of interns and residents, teaching, quality control, autopsies, and other. The Bulletin specified that only compensation allocated to Part A was included in provider cost and that the intermediary would reimburse the provider for this cost only if,

> 1) The provider submits a written allocation agreement (Exhibit A) between the provider and physician that specifies that [sic] respective amounts of time the physician spends for 'A', 'B' and 'C' above.

The Bulletin further provided that in the absence of a written allocation agreement, the fiscal intermediary would assume that 100% of the physician's compensation was allocated to Part B.

The Bulletin also advised providers of the record-keeping requirements of 42 C.F.R. § 405.481(g)(1) through (g)(3) for supporting written allocation agreements between a provider and physicians. It stated that a provider must maintain the data and information used to allocate physician compensation in a form that permits validation by the intermediary. It further stated that providers were required to have each physician complete an attached Exhibit B (Physicians' Time Report) for a period of not less than two weeks per quarter during the fiscal year. Exhibit B divided physicians' time into Part A, B, and C. It did not include a breakdown of Part A time.

The fiscal intermediary found that the physician allocation agreements and the fiscal year 1985 time studies which Plaintiff had submitted in support of its claimed GME costs were not sufficient because they did not break down Part A time into teaching time

and administrative duties. The intermediary found that such costs had to be reclassified since the provider was unable to demonstrate with alternative data that teaching physician time was spent in instructing residents rather than in administrative functions. The Administrator upheld the fiscal intermediary's decision and determined that the reclassification of GME costs was proper under § 413.85 and the documentation requirements of §§ 413.20 and 413.24. He based his determination on the following reasoning: Under § 413.85(g), compensation paid to a faculty physician for time spent teaching residents is a GME cost, while costs for performing administrative duties are reimbursable as administrative and general operating costs. In this case, although the fiscal intermediary required Plaintiff to categorize the time physicians spent performing Part A work into administrative duties, supervision of interns and residents, and teaching, the documentation which Plaintiff had supplied (physician allocation agreements) did not do so. Therefore, the intermediary appropriately determined that such documentation was not an appropriate basis for the allocation of faculty physician compensation for purposes of GME cost reimbursement. The intermediary was justified in reclassifying the costs in accordance with both 42 C.F.R. § 413.20 and § 413.24.

The Administrator further determined that Plaintiff's reliance on 42 C.F.R. § 405.480, et seq. for purposes of determining reimbursement for GME costs was misplaced. The Administrator noted that § 405.480 generally establishes criteria for distinguishing between physician services which are reimbursed to a hospital under Part A from those which are reimbursed under Part B. Because the issue presented in this case was which of the Part A costs of Plaintiff were properly allocated to the GME cost center and which were not reimbursable as GME costs, the regulations governing the allocation of costs among Parts A, B and C were not pertinent.

Plaintiff contends that it was arbitrary and irrational for the Administrator to (1) impose a requirement that Plaintiff keep its records beyond four years, and (2) allocate physician

faculty compensation among the services provided by the physician.

■ In support of its first contention, Plaintiff cites 42 C.F.R. § 405.481(g)(3). That provision mandates that providers retain each physician compensation allocation and the information on which it is based for at least four years after the end of each cost reporting period to which the allocation applies. Plaintiff contends that the reaudit of its GME costs for fiscal year 1985 commenced in 1990, five years after the end of that cost reporting period, and that due to the lapse in time the fiscal year 1985 records were no longer available.

Plaintiff's position is without merit. The cost year in issue ended on June 30, 1985, the fiscal intermediary issued a Notice of Program Reimbursement on February 28, 1986, and the intermediary notified the provider on January 20, 1989 that it was reopening the cost report to appropriately allocate Part A physician time among the physicians' various duties. Accordingly, Plaintiff had notice of the reopening within four years of the close of the cost year and any failure on its part to retain its records following such notice was not justified.

■ In support of its second contention, Plaintiff relies on 42 C.F.R. § 405.481(d). That regulation provides, in pertinent part, that as a general rule, the total physician compensation received by a physician will be allocated among all services furnished by the physician unless the provider certifies that the compensation is attributable solely to the physician's services to the provider, that the physicians bill independently for their services, and that the provider does not receive payment from such billings. In this case, Plaintiff's controller so certified. Plaintiff alleges that it was therefore unnecessary to allocate physician faculty compensation.

The Secretary was entitled to look beyond the controller's certification in order to determine whether the disputed GME costs were properly classified. As the Secretary has pointed out, the certification is dated May 22, 1992, and Plaintiff did in fact have its physicians complete allocation agreements in 1985. In any event, assuming the certification

should be given effect, it means only that total physician compensation will be allocated solely to Part A (physicians' services to the provider). The certification does not resolve the issue of whether Plaintiff was required to make an allocation of services within Part A.

Plaintiff claims that the allocation agreements and time studies which it submitted in fiscal year 1985 comply with applicable Medicare regulations and directives then in effect and should have been accepted by the intermediary as sufficient documentation to support its costs for that year. Plaintiff contends that the time studies performed during fiscal year 1985, which were in the format received from the intermediary as Exhibit B to the March 25, 1985 Bulletin, establish that its teaching physicians spent 100% of their time engaged in reimbursable Part A activities. Plaintiff also claims that the teaching physician agreements which it submitted support the allocation of 100% of teaching physician compensation to GME costs since all of the teaching physician duties, including patient care, education and research, are valid GME costs. Plaintiff claims that the fiscal intermediary's retroactive change in the required time study format for fiscal year 1985 violates Medicare law. *See Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).

The court finds that Plaintiff's position is well-taken. Although the Administrator based his decision on a finding that Plaintiff failed to break down Part A costs, none of the regulations on which the Administrator relied require such a breakdown. Nor has the Secretary pointed to any statute or regulation that requires a breakdown of the duties of teaching physicians and specifies that administrative or other duties are not reimbursable as GME costs. Further, although the regulations mandate that a provider supply sufficient cost data, nowhere is it spelled out exactly what data is required. It was reasonable, therefore, for Plaintiff to rely on the March 1985 Bulletin in order to determine what financial information and data it was required to maintain. According to the Reimbursement Bulletin, a provider was required to do the following in order to be reimbursed for physician compensation

costs: (1) submit a written allocation agreement that specifies the amounts of time the physician spends for Part A, B and C, respectively, and (2) have each physician complete a time report (Exhibit B) for a period of not less than two weeks for each quarter during the fiscal year. It is undisputed that Plaintiff complied with these requirements. The Administrator did not question the veracity of either the allocation agreements, which allocate 100% of teaching physician time to GME costs, or the time records supplied by Plaintiff.

Despite the fact that the regulations did not require a breakdown of Part A time, the Secretary argues that the provider knew of the breakdown requirement since some physicians compensated by Plaintiff did break down their time under Part A and the allocation agreements submitted by Plaintiff listed subcategories under Part A. However, it is not reasonable to impute to Plaintiff knowledge of a requirement to break down Part A time when neither the regulations nor the Reimbursement Bulletin set forth such a requirement. Accordingly, the Secretary's interpretation of the regulations as requiring a breakdown of Part A time is not reasonable and the reclassification of GME costs on the basis of Plaintiff's failure to perform such a breakdown was not proper.

### D. *Reimbursement for Clinical Support Laboratory Costs*

■ The Administrator determined that the research costs associated with the clinical support laboratory are not related to patient care and are therefore not allowable as GME costs. The Administrator reasoned that not all costs related to education are reimbursable as contributing to the quality of care received by a hospital's Medicare patients. Therefore, one must look to the legislative scheme and statutory history of the Medicare program in order to determine what costs are reimbursable. The Administrator looked to 42 C.F.R. § 413.85(a)(1), which provides for reimbursement for the net costs of approved educational activities as calculated in 42 C.F.R. § 413.85(g). Section 413.85(g) states that, "a provider's total costs include trainee stipends, compensation of teachers, and other direct and indirect costs of the

activities." The Administrator interpreted "other direct and indirect costs" to be the costs actually incurred. See § 1861(v)(1)(A) of the Act. The Administrator also looked to § 413.9, which requires that all payments to providers must be based on the reasonable costs of covered services and must be related to the care of beneficiaries.

The Administrator further relied on 42 C.F.R. § 413.90(a), which provides that,

> Costs incurred for research purposes, over and above usual patient care, are not includable as allowable costs.

Section 502 of the Provider Reimbursement Manual defines research in this context as,

> a systematic, intensive study directed toward a better scientific knowledge of the science and art of diagnosing, treating, curing, and preventing mental or physical disease, injury, or deformity; relieving pain; and improving or preserving health
> . . .

Section 502.2 defines "usual patient care" as,

> the care which is medically reasonably, necessary, and ordinarily furnished (absent any research programs) in the treatment of patients by providers under the supervision of physicians as indicated by the medical condition of the patients.

The Secretary determined that in this case, the record supported the finding that the clinical support laboratory is involved in research activities, including pure research activities, as defined at Section 502 of the PRM, which are not related to usual medical care. Therefore, the costs do not meet the criteria under 42 C.F.R. § 413.85(g) for reimbursement as "other direct or indirect costs" of the provider's GME activities.

Plaintiff claims that the activities of the clinical support laboratory are approved educational activities as defined under 42 C.F.R. § 413.85(b) and that such costs are therefore reimbursable in accordance with § 413.85(a). Section 413.85(a) states that "a provider's allowable cost may include its net cost of approved educational activities." Section 413.85(b) defines "approved educational activities" as:

> formally organized or planned programs of study usually engaged in by provider in

order to enhance the quality of patient care in an institution.

Section § 413.85(d) list activities not within the scope of approved educational activities. Plaintiff notes that research is not among the excluded activities. Plaintiff further claims that the laboratory is a mandatory component of the GME program according to the guidelines set forth by the Accreditation Council for Graduate Medical Education (ACGME).

The court finds that the Secretary could reasonably conclude that the activities of the clinical support laboratory constitute research activities which are over and above usual patient care and are therefore not reimbursable under the pertinent regulations. This conclusion is supported by the testimony of Dr. Thomas Saladin, Plaintiff's current director of medical education. Dr. Saladin testified that the clinical support laboratory was created solely to meet research requirements from the ACGME (R. 373). His additional testimony supports the Administrator's conclusion that the activities of the laboratory are primarily research activities. While such activities may somehow indirectly benefit patients within the hospital, the Administrator could reasonably determine that the connection between the clinical support laboratory activities and patient care in the hospital is too tenuous to support reimbursement of such activities. For these reasons, the Secretary's decision disallowing the costs of the clinical support laboratory must stand.

### III. Conclusions of Law

1. The court has jurisdiction over this lawsuit pursuant to 42 U.S.C. § 1395oo and 5 U.S.C. § 704.

2. The Secretary's determination that the fiscal intermediary had the authority to reopen Plaintiff's cost report for fiscal year 1985, to reclassify erroneously classified Graduate Medical Education costs, and to recoup reimbursements for such costs pursuant to 42 C.F.R. § 405.1855 and § 413.86, is not arbitrary, capricious, or otherwise not in accordance with law.

3. The Secretary's determination that the consistency rule codified at 42 C.F.R. § 412.113(b) did not prohibit the fiscal intermediary from recouping erroneously classified GME costs for the fiscal year 1985 is not arbitrary, capricious, or otherwise not in accordance with law.

4. The Secretary's interpretation of Medicare regulations as requiring a breakdown of Part A physician services for the period in question is not reasonable, and the reclassification of Plaintiff's GME costs based on Plaintiff's failure to perform such a breakdown was not proper.

5. The Secretary's determination that the activities of the clinical support laboratory are research activities under § 413.90 which do not enhance the quality of patient care at Plaintiff hospital, and are therefore not reimbursable, is not arbitrary, capricious, or otherwise not supported by law, and is supported by substantial evidence.

6. This case hereby is REMANDED to the Secretary with instructions to pay Plaintiff Medicare reimbursement in the amount of $313,558, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2).

LET JUDGMENT ISSUE IN ACCORDANCE WITH THE FOREGOING.