**JACKSON PARK HOSPITAL
FOUNDATION**

v.

**The UNITED STATES.**

**No. 37–80C.**

United States Court of Claims.

Aug. 19, 1981.

Robert G. Higgins, Chicago, Ill., for plaintiff; Erwin I. Katz, Chicago, Ill., attorney of record. Alvin L. Kruse and Hoffman & Davis, Chicago, Ill., of counsel.

Lorraine B. Halloway, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant; Sandra P. Spooner, Washington, D. C. and Thomas Stuber, Baltimore, Md., of counsel.

Before DAVIS, KASHIWA and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge:

Jackson Park Hospital Foundation (Foundation) asks reimbursement under the Medicare Act, 42 U.S.C. § 1395 *et seq.* (1976) (amended Supp. III 1979), for costs based on the depreciation of its hospital and on interest payments it made. The Government says that regulations promulgated under the Act, 42 U.S.C. §§ 1395x(v)(1)(A), 1395hh (1976), prevent further reimbursement because of the close relationship between the Foundation and its seller and lender. The case properly comes before us on cross-motions for summary judgment. We hold for the defendant.

### I

Plaintiff Foundation is a not-for-profit corporation that purchased, on March 31, 1967, nearly all of the stock of Hospital Company, Inc. (Company), a for-profit corporation which then owned and operated Jackson Park Hospital, a provider of services under the Medicare program. Company was liquidated the next day, and Foundation operated the hospital as a provider. According to the administrators, the purchase price for the hospital was $3,012,268, consisting of $462,454 in cash and $2,549,814 in 4% sinking fund bonds issued to Company's participating shareholders. It is admitted, for the purposes of this case, that these were reasonable figures, within the range of fair market values.

In seeking reimbursement for its services under the Medicare Act for the periods ending March 31, 1968 through 1972, the plaintiff claimed depreciation expenses based on the purchase price it paid for the hospital and on interest expenses for the 4% bonds. The Blue Cross Association and

Hospital Service Corporation (the Plan), the fiscal intermediary that initially determines the amount of reimbursement the plaintiff is entitled to under the Act, decided that Jackson Park Hospital Company and Jackson Park Hospital Foundation were organizations related through common control, within the meaning of the Medicare regulations, 42 C.F.R. §§ 405.419(c)(1) and 405.-427 [1]—directives which restrict reimbursement for depreciation and interest. After some intermediate steps, now irrelevant,[2] the Hearing Officers denied all depreciation above Company's historical cost and also denied all interest. From this decision the plaintiff unsuccessfully appealed within the agency and then sought relief from the District Court for the Northern District of

Illinois, which transferred the case to this court pursuant to 28 U.S.C. § 1406(c) (1976).[3]

## II

■ The opening question is whether Foundation was related to Company within the Medicare regulations on depreciation and interest (42 C.F.R. § 405.419 and § 405.427, *supra*, note 1). There is no material dispute as to the underlying facts found by the Hearing Officers. Seven of the twelve directors of Foundation were themselves, or through marriage, owners of 83% of Company's common stock and the president of Foundation's board of directors owned 80% of Company's common stock.[4]

1. 42 C.F.R. § 405.419(c)(1) (1980) provides in part: "To be allowable, interest expense must be incurred on indebtedness established with lenders or lending organizations not related through control, ownership, or personal relationship to the borrower. Presence of any of these factors could affect the 'bargaining' process this usually accompanies the making of a loan, and could thus be suggestive of an agreement on higher rates of the interest or of unnecessary loans. Loans should be made under terms and conditions that a prudent borrower would make in arms-length transactions with lending institutions. The intent of this provision is to assure that loans are legitimate and needed, and that the interest rate is reasonable. Thus, interest paid by the provider to partners, stockholders, or related organizations of the provider would not be allowable. * * * "

   42 C.F.R. § 405.427(a) (1980) provides: "Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere."

   42 C.F.R. § 405.427(b)(1) (1980) defines "related to provider": "Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies."

   Medicare regulations originally codified in 1966 under Title 20 of the Code of Federal Regulations can now be found under Title 42 (since 1977—*see* 42 Fed.Reg. 52826 (1977)). There have been no relevant changes and citations will be to 42 C.F.R. (1980).

2. Originally, the Plan allowed depreciation only on the historical cost of the facility to Compa-

ny, the seller, but allowed interest on what it considered a "fair purchase price." On administrative appeal, the Blue Cross Association Medicare Provider Appeal Hearing Officers affirmed the Plan as to depreciation but allowed reimbursement on all interest because of the exception in 42 C.F.R. § 405.419(c)(2) for loans "made prior to July 1, 1966." The Bureau of Health Insurance of the Social Security Administration subsequently required that this decision be reopened because, the agency ruled, the regulation did not permit interest on any portion of loans between related parties and also because the agency interpreted the exception for loans made prior to July 1, 1966, as requiring that the loans must be consummated as well as arranged before then. The Hearing Officers then amended their decision, this time holding against the plaintiff on both depreciation and interest. Plaintiff filed suit in the United States District Court for the Northern District of Illinois and obtained an order remanding the case because of the agency's failure to comply with its own procedural requirements in effecting the amendment to the original decision of the Hearing Officers. On remand and after additional briefing, the Hearing Officers issued the final decision now under review.

3. We have jurisdiction (for the years involved) under 28 U.S.C. § 1491 (1976) (amended Supp. III 1979). *Whitecliff, Inc. v. United States*, 210 Ct.Cl. 53, 536 F.2d 347 (1976), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).

4. There is an insignificant discrepancy in the findings of the Hearing Officers and those of the Plan. The latter found that eight of fifteen (not seven of twelve) directors owned nearly 83% of Company's common stock and 15.34% of the preferred.

Plaintiff attacks, however, the ultimate administrative conclusion that there was common control of Company (the seller) and Foundation (the buyer).

Whatever our standard of review of that ultimate conclusion,[5] we uphold it as a correct application of the regulations, supported by substantial evidence, and neither arbitrary nor capricious. That the people who "owned" the Company "controlled" but did not also "own" the non-profit Foundation is surely not dispositive; Company's majority stockholder-owners plainly controlled it, as the administrators implicitly found.[6] The same persons therefore controlled both entities. Several judicial holdings are quite comparable. *See, e. g., Stevens Park Osteopathic Hospital, Inc. v. United States,* 225 Ct.Cl. ——, ——, 633 F.2d 1373, 1378–79 (1980), in which the court upheld the intermediary's finding of relatedness (the plaintiff had not challenged it) based on an assessment that one Dr. X had the power to play a significant role in the management and control of both the seller and the buyer in the transaction there involved (Dr. X owned 75 percent of the seller's stock and held powerful positions in the management of the buyer); *Goleta Valley Community Hospital v. Schweiker,* 647 F.2d 894, 896–97 (9th Cir. 1981) (the non-profit buyer's trustee-members were also partners in the for-profit seller); *American Hospital Management Corp. v. Harris,* 638 F.2d 1208 (9th Cir. 1981) (three of seven of seller's partners had a 30% interest in buyer; president of seller was the only general partner of buyer); *Fairfax Hospital Ass'n v. Mathews,* 459 F.Supp. 429 (E.D.Va.1977), *aff'd sub nom Fairfax Hospital Ass'n v. Califano,* 585 F.2d 602 (4th Cir. 1978) (sole owner of a supplier-pharmacy was a member of the provider-hospital's Board of Directors, had originated the plan to build the hospital, and owned 6.3% of its stock). The two organizations in this case were obviously "related" under the regulations.

### III

This court has already upheld the validity of § 405.427 (the regulation bearing on the depreciation allowance, note 1, *supra*) in the somewhat different context of an ongoing relationship, holding that the section supports the purposes of the Medicare Act and provides an acceptable rule for defining "reasonable cost" under 42 U.S.C. § 1395x(v)(1)(A). *Stevens Park Osteopathic Hospital, Inc. v. United States, supra,* 225 Ct.Cl. ——, ——, 633 F.2d 1373, 1379–80 (1980) (lease terminating in sale); *Pasadena Hospital Ass'n v. United States,* 223 Ct.Cl. ——, ——, 618 F.2d 728, 732–34 (1980) (lease only). Plaintiff asks us not to apply the same ruling to a one-time sale, as the present one is said to be.[7] We reject this

---

5. This court has usually announced and applied the "arbitrary or capricious or unsupported by substantial evidence" test for factual determinations made under the Medicare regulations pursuant to Part A of the Act. *E. g. Overlook Nursing Home, Inc. v. United States,* 214 Ct.Cl. 60, 65, 72, 556 F.2d 500, 502, 506 (1977); *Gosman v. United States,* 215 Ct.Cl. 617, 621–22, 623, 573 F.2d 31, 34, 35 (1978); *Stevens Park Osteopathic Hospital, Inc. v. United States,* 225 Ct.Cl. ——, ——, 633 F.2d 1373, 1378, 1381 (1980). In *Goldstein v. United States,* 201 Ct.Cl. 888, 889, *cert. denied,* 414 U.S. 974, 94 S.Ct. 287, 38 L.Ed.2d 217 (1973), the court spoke only of review under the Constitution and statutes. Although *Stevens Park, supra,* 225 Ct.Cl. at ——, 633 F.2d at 1376, suggests in one place that there might be such a limitation on our review of factual determinations, the court in that case did seek (and find) substantial evidence to uphold certain challenged findings.

6. Plaintiff claims the separation between ownership and control is dispositive under § 1004 of the Provider Reimbursement Manual (Health Insurance Manual 15) (issued 1968–69) which says that the tests of common ownership and control are to be applied separately. Clearly, however, 80% or 83% ownership of Company's common stock by individuals in control of Foundation amounted to the power to control both, even if the Board of Directors of Company, and not its shareholders, made the individual decisions concerning the day-to-day management of Company, as plaintiff contends. There was evidence introduced at the hearing that Company's shareholders selected its Board.

7. We assume *arguendo* that there was no operative ongoing relationship here but it does appear that the relationship between Foundation and Company persisted over many years. Prior to the sale, Foundation conducted research and educational activities at the hospital, ran a clinic, and received its funding from Company.

invitation and the arguments plaintiff advances.[8]

First, the regulation's language can apply beyond long-term relationships. Even though the word "sale" never appears, the phrases "costs applicable to * * * facilities * * * furnished to the provider" and "[w]here the provider obtains * * * facilities," see § 405.427(a), (c)(2), can readily apply to a single acquisition by purchase, as well as to an ongoing lease (or other long-term arrangement). Although the example given in section (c)(2) of the regulation describes a lease arrangement, it is no more than an example and does not confine the regulation to that particular situation.[9]

Secondly, the purposes of § 405.427 apply equally to one-time sales and on-going relationships. The rule has been described as both a prophylactic measure and a means of defining "costs." *Stevens Park Osteopathic Hospital, Inc. v. United States, supra*, 225 Ct.Cl. at ——, 633 F.2d at 1379, says: "[T]his regulation like other 'related organization' rules, is intended to have a 'prophylactic' effect in guarding against bad faith dealing between organizations related through common control without inquiry into particular circumstances. * * * It is evident that inquiry into the fairness of transactions between related parties would be a demanding task indeed for the fiscal intermediary, while inquiry into the usually simpler issue of common control probably would have to take place anyway." In *Stevens Park, supra*, the sale of the hospital terminated a five or six year lease agree-ment, and so the court treated the relationship as an ongoing one.[10] But the prophylactic rule is useful even for a one-time sale. Although it might be easier for the Secretary to look only once into the possibility of self-dealing than to monitor the problem repeatedly as an ongoing relationship could require, it is still a burdensome task, as the court in *Stevens Park* noted. And the possibility of self-dealing (with resulting excessive or unnecessary charges to Medicare) is as real for a one-time sale as for continuous dealings.[11]

Connected with this prophylactic goal, § 405.427 embodies a special objective that likewise makes the provision applicable to one-time sales. *See Pasadena Hospital Ass'n v. United States, supra*, 223 Ct.Cl. at ——, 618 F.2d at 732–33 (1980) (§ 405.427 defines "cost"—for situations in which the parties are related—as cost to the seller, not cost to the buyer). For a one-time sale between related parties, § 405.427 accomplishes the Secretary's goal, expressed repeatedly in 42 C.F.R. § 405.415, of triggering the realization of appreciation (for purposes of obtaining reimbursement for depreciation) only when there is a bona fide transaction ending in a bona fide change in ownership. 42 C.F.R. § 405.415(g). Section 405.427 says that "[w]here the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, in effect the items are obtain-

8. *Goleta Valley Community Hospital v. Schweiker, supra*, 647 F.2d 894, 897 (9th Cir. 1981), has sustained § 405.427 as applied to what the court considered to be a one-time sale. *See also American Hospital Management Corp. v. Harris, supra*, 638 F.2d 1208 (9th Cir. 1981).

9. The application of § 405.427 to one-time sales was made explicit by section 1008 of the Provider Reimbursement Manual (Health Insurance Manual No. 15) (issued in 1968–69). Plaintiff objects to reliance on that document for this purpose because it was not a properly issued regulation. However, our discussion in this Part III shows that section 1008 did not at all change or expand existing law but merely interpreted it, and that without section 1008

the prevailing regulation governed plaintiff's purchase of the hospital. Nor was Foundation adversely affected by the fact that the Manual was not published in the Federal Register. *See Saint Francis Memorial Hospital v. United States*, 648 F.2d 1305, at 1308–1309, 1311–1312 (Ct.Cl.1981).

10. Although the provider in *Stevens Park* sought reimbursement solely for depreciation based on the sales price paid and not on the rents, the sales price included some overdue rent.

11. Comparable prophylactic rules exist in other areas of the law, *e. g.*, a fiduciary's sales to his beneficiary.

ed from itself." § 405.427(c)(2). *See Stevens Park, supra,* 225 Ct.Cl. at ——, 633 F.2d at 1379. Thus, § 405.427 makes it certain that, when the parties to a transaction are related because of common ownership or control, there should be no revaluation upward of the property by fiat of the joint controlling interest. Medicare is not to pay for, or be loaded with, increased costs brought about simply by a sale from one entity to its *alter ego.*

The sum of it is that the prophylactic rule of § 405.427, as applied here, reasonably supports the dual goals of helping the administrators avoid paying collusive or improperly increased costs, and of reducing the administrative burden.

■ It does not help Foundation to rephrase its objections to § 405.427 as creating an impermissible irrebuttable presumption against providers who buy from related sellers. The regulation establishes a rational prophylactic provision, which itself constitutes the substantive rule, not a presumption of the existence of another underlying fact (such as overreaching or lack of bona fides). In the social security context of Medicare, such reasonable prophylactic provisions are acceptable for reimburse-

ment of a provider's costs. *See Weinberger v. Salfi,* 422 U.S. 749, 774 *et seq.,* 95 S.Ct. 2457, 2471, 45 L.Ed.2d 422 (1975). Foundation is not in a "suspect" class entitled to heightened protection, and there are no fundamental rights at stake. Under the normal standard, as we have shown, § 405.-427 must be upheld.[12]

IV

The same factors sustain § 405.419 (note 1, *supra* ), barring interest paid to related lenders, and there is no need to duplicate our analysis. Foundation tries, of course, to appeal to *Trustees of Indiana University v. United States,* 223 Ct.Cl. ——, 618 F.2d 736 (1980). The court there made an exception to § 405.419 limited to those particular facts—the provider was a non-profit hospital affiliated with a state university, received no money from the state, was prohibited by law from borrowing outside, and received its loan from the university at a below-market rate of interest. The low interest rate suggested that the hospital and university did not in fact collude to obtain excessive rates, and there was no suggestion that the loans were unnecessary. Equally important, the circumstances virtually ruled out the likelihood of collusion or

12. Although *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 422 (1975), addressed a challenge to a statute, its reasoning applies as well to regulations. *See Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 376–77, 93 S.Ct. 1652, 1664, 36 L.Ed.2d 318 (1973) (on which *Salfi* relies) and *Knebel v. Hein,* 429 U.S. 288, 297, 97 S.Ct. 549, 555, 50 L.Ed.2d 485 (1977). Other courts relying on *Salfi* have upheld the very regulations at issue here against comparable challenges. *See e. g. Fairfax Hospital Ass'n v. Califano,* 585 F.2d 602 (4th Cir. 1978) (upholding 42 C.F.R. § 405.427); *Caylor-Nickel Hospital, Inc. v. Califano,* [1980] Medicare-Medicaid Guide CCH ¶ 30,718 (N.D.Ind. Sept. 10, 1979) (upholding 42 C.F.R. § 405.-419(b)(3)(ii)) and *Chelsea Community Hospital v. Michigan Blue Cross,* 436 F.Supp. 1050, 1061–63 (E.D.Mich.1977) (upholding 42 C.F.R. § 405.427), *remanded on jurisdictional grounds,* 630 F.2d 1131 (6th Cir. 1980).

In *South Boston General Hospital v. Blue Cross of Virginia,* 409 F.Supp. 1380 (W.D.Va. 1976), the court held that the Secretary could not, through these regulations (§§ 405.419 and 405.427), avoid individual scrutiny of the provider's purchase, where there was, as here, a

single sale. For the reasons already stated, we disagree with that court's broad conclusion that those regulations cannot in general be applied prophylactically. *See also Fairfax Hospital, supra.* In addition, the *South Boston* court found severe injustice in applying the regulations in that case. If there is any exception for plain injustice where the seller is a profit entity, we could not utilize it here. The only special factor alleged is that Company would have gone bankrupt if it had continued and not been transmuted into a non-profit organization such as Foundation. But that is not to say that the sale of the hospital could not have been made at Company's historical cost. In any event, one of the purposes of the Medicare program is not to replenish bankrupt medical facilities (*Caylor-Nickel Hospital, Inc. v. Secretary,* [1979] Medicare-Medicaid Guide (CCH) ¶ 29,-619 at 9909 (N.D.Ind., March 1, 1979), citing S.Rep.No.404, 89th Cong., 1st Sess. 1, *reprinted in* [1965] U.S.Code Cong. & Ad. News (1943– 44)) and the regulations should not be construed or applied to permit owners of hospitals to avoid bankruptcy at the expense of Medicare.

undue influence of any kind:—neither the state university nor the non-profit hospital had a profit motive, and the university had only limited control of the hospital. Also, the provider's situation was such that it would have created a plain injustice to disallow its interest payments since it was unable by law to obtain funds on the open market.[13] This special exception carved out in *Trustees* cannot be used in the current case where none of those elements exists. Rather, the seller (Company) was a for-profit corporation, said to be nearly bankrupt, and the possibility of tainted purposes cannot be automatically ruled out.

■ Plaintiff also invokes the express exception in the regulation for loans between related parties made prior to July 1, 1966, but we affirm the decision of the agency that the loan here does not fall within that qualification. Whether or not this separate treatment is available for loans made but not consummated prior to that date—the agency held not, *see also Northwest Hospital, Inc. v. Hospital Service Corp.*, 500 F.Supp. 1294, 1296 (N.D.Ill.1980)—the regulation clearly requires that "the terms and conditions of payment of such loans have been maintained in effect without modification subsequent to July 1, 1966." 42 C.F.R. § 405.419(c)(2). Company and Foundation modified their agreement in December 1966 to reflect a reduction in the purchase price of the hospital recommended by the Internal Revenue Service so that Foundation could retain its tax exempt status. As a result, an agreement was made in December 1966 to issue the 4% sinking fund bonds to cover $129 per share of the new $130

purchase price of the common stock, instead of $137 per share on $138 as originally agreed before July 1, 1966. This modification in the amount of the loan removes the agreement from the exception and bars recovery, based on that exception, for interest costs between these related parties.[14]

■ Finally, Foundation seeks partial reimbursement for interest on the portion of the loan that covers the seller's historical cost for the facility. This claim misconceives the words and structure of § 405.-419(c). In its terms, the section bars *all* interest. The regulation denies interest not so much because of the nature of the transaction for which the loan is obtained but because of the source of the loan. Section 405.419(c) is not as concerned that the *sale* was between related parties (except to the extent that the necessity of such a sale, and hence of a loan to pay for it, is in doubt) as it is that the *loan* was between related parties. Thus, even if the sale had been between strangers, § 405.419(c) would operate so long as the loan to pay for it came from a related entity. The Secretary considers it more likely that, when a loan is made between unrelated parties bargaining at arms length, the interest rate will prove reasonable and the loan itself necessary. The Secretary's allowance here of the seller's historical cost for purposes of depreciation reveals nothing about the necessity or propriety of interest payments for a loan to cover the sale (even at that cost) to a related organization. The Secretary would therefore be required to examine the bona fides and reasonableness of the loan even for the pro-rated amount—precisely the

13. Another factor affecting the outcome, not present here, was a concern to avoid raising a First Amendment question. The exception in § 405.419(c)(2) for loans from religious orders to a provider operated by members of the order might be of questionable constitutional validity if similar loans between affiliated but non-religious non-profit institutions were disallowed.

14. Although the Hearing Officers originally found both that the loan was made and was not modified after July 1, 1966, that decision was vacated when the Social Security Administration decided that loans must be completed, and not merely arranged, prior to July 1, 1966. On

remand, the intermediary ruled that the loan was not consummated in time. Thus we are not technically in the position of reviewing a factual finding by the agency as to whether there was a modification. In any event, there can be no dispute that the amount of the loan was changed, and the plaintiff acknowledges it in its petition. Paragraph 8(e). We hold that such a change in the amount of the loan modifies the terms of the loan under the exception in § 405.419, even though other essential terms—such as the interest rate—remain unchanged.

kind of investigation the regulation is designed to avoid. In that respect the across-the-board scope of § 405.419(c) is reasonable and acceptable. We therefore hold that the plaintiff is not entitled to reimbursement for a pro-rata portion of its interest payments.[15]

For these reasons, plaintiff's motion for summary judgment is denied and defendant's cross-motion is granted. The petition is dismissed.

15. *Northwest Hospital, Inc. v. Hospital Service Corp., supra,* 500 F.Supp. 1294, 1298–99 (N.D. Ill.1980), grants partial interest based on similar facts (a sale of a facility by a profit seller to a related non-profit purchaser with 4% bonds issued to the seller), but we do not concur in that decision.

The plaintiff here has not argued that a denial of partial reimbursement would place it in the position of being reimbursed for fewer costs than Company, the seller, would have received, had there in fact been no sale or loan between these parties. The record does not show that Company had any comparable loan on which it had to pay interest.

