**NORTH IOWA MEDICAL CENTER, Plaintiff,**

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.**

**No. 00CV3070–DEO.**

United States District Court, N.D. Iowa, Central Division.

March 29, 2002.

Roberta M. Anderson, Schroeder & Anderson, Mason City, IA, Hideaki Sano,

Robert M. Jackson, Chris E. Rossman, Honigman, Miller, Schwartz & Cohn, Detroit, MI, Richard H. Moeller, Berenstein, Moore, Berenstein, Heffernan & Moeller, LLP, Sioux City, IA, for Plaintiff.

Lawrence D. Kudej, Stephanie Johnson Wright, U.S. Atty's Office, Northern District of Iowa, Cedar Rapids, IA, for Defendant.

### ORDER

DONALD E. O'BRIEN, Senior District Judge.

This matter comes before the Court upon what has been designated by the litigants as plaintiff's motion for summary judgment (Docket No. 7) and defendant's cross motion for summary judgment (Docket No. 18). However, it is really before the Court under the Administrative Procedure Act as an appeal. After careful consideration of the parties' written briefs and oral arguments, as well as the relevant case law, plaintiff's motion for summary judgment (Docket No. 7) is **sustained.** Defendant's motion for summary judgment (Docket No. 18) is **denied.** These words are used so that the Clerk of this Court can close those motions in their records. Under the Administrative Procedures Act, this ruling reverses the administrator's decision of June 28, 2000, denying the plaintiff's application for cost reimbursement in the sum of 3.2 million dollars.[1]

### I. BACKGROUND

Before June 1993, there were two hospitals operating in Mason City, Iowa. North Iowa Medical (plaintiff here, a/k/a Provider) and St. Joseph Mercy Hospital (SJMH). In November 1992, negotiations began for the purpose of consolidating the two hospitals into a new entity. In June 1993, the plaintiff sold its hospital facility to the acquiring entity, the North Iowa Mercy Health Center (NIMHC), for a price substantially below book value[2]. This caused the plaintiff to incur a significant loss totaling $3,256,187.00. At the same time, SJMH also transferred its hospital to NIMHC. Since that time, NIMHC operates the only acute care licensed hospital in Mason City, Iowa.

Under Medicare regulations, a hospital such as plaintiff, can get reimbursed for the loss on the sale of its patient care-related assets. The plaintiff argues that it should be reimbursed for the $3,256,187.00 which it has been trying to recover since the date of the sales transaction. The Department of Health and Human Services (government) has refused to pay the plaintiff this reimbursement.

On April 30, 1996, the Intermediary[3], Wellmark Blue Cross Blue Shield of Iowa, denied the plaintiff's initial claim for payment, finding that the sales transaction occurred between "related" parties. The plaintiff proceeded to go through the administrative appeals process. On May 2, 2000, the Provider Reimbursement Review Board (PRRB), acting as the sole trier of fact, ruled in favor of the plaintiff here. It found that all the requirements for reimbursement of a loss after a sale were satisfied. (i.e. the sale was at arms' length; the sale was between unrelated parties; the consideration paid was consistent with fair

---

1. At the hearing, counsel informed the Court that this was a complex matter not easy to explain. (Tr. 27). If this Court has misnomered or misnamed some fact or entity, the Court will promptly address that matter when it is called to its attention.

2. According to Mr. Rossman, plaintiff's attorney, "book value is a number that is in almost

all circumstances different from the fair [market] value because book value is simply what you originally paid minus depreciation that you have taken over the years, and it is really an accounting asset." (Tr. 58).

3. An intermediary is a preliminary decision maker provided under applicable law to decide the controversy.

market value). The next step in the appeal process was to have the decision reviewed by the Health Care Financing Administration (HCFA). This group, after review, reversed the PRRB on June 28, 2000, finding for the defendant here, the government.

The plaintiff then filed this action in this Court pursuant to Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

## II. STANDARDS OF REVIEW

The Medicare Act states that this Court's review of the Administrator's decision is governed by the Administrative Procedure Act (APA), 42 U.S.C. § 1395oo(f)(1). The APA states that an Administrator's decision must be overturned if its arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence in the record or otherwise contrary to law. 5 U.S.C. § 706.

The Secretary of the Department of Health and Human Services has promulgated regulations on capital costs, including reimbursement regulations for gain or loss on the disposal of depreciable assets rendered to patients under the Medicare program.

## III. ARGUMENTS—WAS THERE A BONA FIDE SALE TRANSACTION?

Under 42 C.F.R. § 413.134(f), a sale of depreciable assets is bona fide if (a) fair market value is paid for the assets, and (b) the sale is negotiated (i) at arms' length (ii) between unrelated parties. In order for the plaintiff to be entitled to receive reimbursement, these factors must be met. The Court will now analyze the record as it pertains to these issues.

### A. *Fair Market Value*

The plaintiff states that the only evidence regarding fair market value was the appraisal done by Valuation Counselors Group, Inc. (VCGI), an independent appraiser. VCGI assessed fair market value of the acquired assets as of June 30, 1993 to be $7,015,100. Therefore, plaintiff argues, the amount of the consideration ($7,015,100.00) for the purchased assets is consistent with the fair market value of the acquired assets. The government argues that there is a disparity of as much as $4 million between the purchase price and the value of the assets transferred. This disparity, according to the government, is so significant that it justifies "the inference that the transaction could not have been the result of an arms' length bargaining but was the product of a relationship between the parties where one side controlled or significantly influenced the other." (Defendant's. Brief at 29). Furthermore, at the PRRB hearing, Mr. Rossman, counsel for plaintiff/provider, stated that he and the Intermediary (Wellmark Blue Cross and Blue Shield of Iowa) had stipulated as to the "accuracy and completeness" of the appraisal of the Provider. (AR 4 89–90).

The government argues that Mr. Grimes, the lawyer for the intermediary Blue Cross and Blue Shield of Iowa, "is not good with numbers" and that "[h]e didn't stipulate that this was in fact fair market value ... [h]e just stipulated he wasn't going to contest numbers." (Tr [4] .47–48).

The Court cannot now conclude that there was a flat out stipulation as to the fair market value that would make this a non-issue. The testimony about what was

---

**4.** "Tr" refers to the transcript of the hearing on the motion for summary judgment held before this Court.

stipulated to is too iffy for that to carry the day.

The Court in preparing for the hearing read much of, if not all, of a very voluminous record. Prior to the hearing, the Court made a list of some of the financial aspects of the transaction and during the hearing, asked a number of questions in relation thereto. Counsel for the government in his closing response (Tr. 71–72) stated, "it was difficult to respond to this Court's questions in connection with some of the financial aspects because that was not fully developed in the hearing below regarding fair market value." That situation did not help this Court in its effort to get to the nub of this issue. Under the law, we are now stuck with that "incomplete" record. However, two previous decision makers ruled on the issue and this Court will also.

The issue of fair market value is intermingled with other issues and will be discussed further in this ruling.

### B. *Negotiation at Arms' Length*

The government argues that if there's a litmus test for an arms' length transaction between unrelated parties it is the presence or absence of separate and independent legal counsel for each side. The government asserts that the plaintiff and SMHC became "significantly associated" when both received legal advice from the same law firm of Baudino & Crawford, P.C. The plaintiff argues that "[d]efendant's sole "proof" of the parties' use of the same counsel is a letter from the Provider's attorney Robert Baudino to *his client* (the plaintiff/provider)—and not sent to SMCH—"advocating" a change in the transaction. (AR 79–81). Contrary to government's contentions, the plaintiff argues that this letter actually supports the existence of separate representation as Mr. Baudino was advising solely *his client* (plaintiff here) and not SMCH." *Plaintiff's*

*Reply Brief* at 6 n. 7. The plaintiff further asserts that both parties negotiated the sales transaction in furtherance of their own interests and objectives. In further support of this argument, the plaintiff points to the fact that both Mr. Baudino (attorney for the plaintiff/Provider) and Chris Rossman (attorney for NIMHC and SMHC) witnessed the signatures to the Purchase Agreement. (AR 228–229).

While the fact that Mr. Baudino and Mr. Rossman witnessed the signatures to the Purchase Agreement is undoubtedly true, this Court is not persuaded that this adds much to the weight of their argument. However, the government has failed to persuade this Court that Mr. Baudino was giving legal advice to anyone other than his client, the plaintiff, in that letter. The Court is aware that Mr. Baudino also said in a board meeting that the mode of the transaction must be changed to an asset sale. This will be discussed later in this order.

### C. *Unrelated Parties*

The plaintiff argues that plaintiff and NIMHC were unrelated parties at the time the purchase agreement was negotiated and executed, because there was no shared common *control* or common *ownership* between them at that time. Under Medicare regulations, 42 C.F.R. § 413.17(b) and PRM § 1002, a party is considered "related" to another party for purposes of a sales transaction under the following circumstances:

*Related to the provider* [plaintiff here] means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

*Common ownership* exists if an individual or individuals possess *significant* ownership or equity in the provider and

the institution or organization serving the provider

Control exists if an individual or an organization has the power, directly or indirectly, *significantly* to influence or direct the actions or policies of an organization or institution.

42 C.F.R. § 413.17(b) and PRM § 1002. (emphasis added). *See also Eastland Memorial Hosp. v. Blue Cross Blue Shield of Texas,* PRRB Hearing Dec. No. 96–D37 (May 10, 1995), CCH ¶ 44, 789 (parties are related if they share either common control or common ownership).

The plaintiff asserts that because the government has failed to allege the issue of common *ownership,* the Court should focus on whether the government has presented any evidence of common *control. Plaintiff's Reply Brief* at 2–3. Further, the plaintiff argues that the Court should disregard the government's attempt to create a brand new "association" standard, which does not exist in the Provider Reimbursement Manual.

As to the issue of *common control,* (not to be confused with *common ownership* which does not appear to be an issue here,) there are various issues that must be discussed. The Court must keep in mind that if a control relationship does exists, it must be *significant. See* 42 C.F.R. § 413.17(b) & PRM § 1002.

### 1. *Memorandum of Understanding*

■ The first issue the Court will address in analyzing whether there was common control is the Memorandum of Understanding (MOU). The government argues in its brief that the MOU is evidence of a significant control relationship between the plaintiff (Provider) and NIMHC. The government characterizes the MOU as creating a "joint venture" and argues that both parties became "associated to a significant extent with each other" at the time they entered into the MOU. (Defendant. Brief at 15–16).

The plaintiff argues that the MOU did not create a joint venture, that it was a "non-binding" statement of "the present intentions of the parties." (AR 250). According to the plaintiff, the MOU was the initial step in a potential transaction. (AR 109–110, 131). The plaintiff further points out that the MOU expressly states that it was not binding and did not create any legal obligations. *Plaintiff's Reply Brief* at 3. The plaintiff also argues that if the Court were to interpret the MOU as a legally binding document, that it would be creating binding obligations between objectively unrelated parties. *Id.* at 3. The plaintiff further points out that the idea of such an interpretation was found to be absurd by the Chairman of the independent PRRB. (AR 71).

The MOU states in pertinent part as follows:

*[t]his Memorandum of Understanding does not constitute a binding agreement of the parties, but instead sets forth the present understandings and present intentions of the parties with respect to consolidation. The parties intend to continue their mutual discussions and, in the event agreement is reached, reflect their mutual understandings in definitive agreements (the "Definitive Agreements") binding upon the parties, provided, however, until Definitive Agreements are reached and executed either party may terminate this Memorandum of Understanding at any time for any reason.*

Memorandum of Understanding (emphasis added).

Based on the clear words set out above, and on the fact that counsel for the government, during the hearing held in this case, flatly stated "it [the MOU] is clearly a non-binding agreement of intent," (Tr. p.

33) this Court is persuaded that the PRRB decision was correct in concluding that the MOU, dated November 19, 1992, is not a legally binding document that establishes a significant relationship or affiliation between the parties. This Court, therefore, concludes that the existence of the MOU between the parties did not constitute common control and is not evidence that the parties were "related parties."

### 2. *Sale v. Consolidation*

■ Another debated issue relating to whether the negotiations were at arms' length between unrelated parties is the fact that there was a conversion of the transaction from a "consolidation" to a "sale". The government argues that this conversion of the transaction from a "consolidation" to a "sale" was made in order to gain Medicare reimbursement for loss on a sale, and is certainly evidence of the lack of arms' length negotiations between the parties. The plaintiff answers that this argument ignores the PRRB's correct interpretation of the Medicare regulations that recognize that a loss can be from a merger or a consolidation, as well as a sale. *See* HCFA Pub. 13–4; MIM § 4502.7. The plaintiff points to an August 24, 1994 letter from Mr. Booth, HCFA's Director of Payment Policy to Michael Maher, partner for Coopers & Lybrand, where Director Booth opined, speaking as a government official, that a transaction where Hospitals A and B merge to form Hospital C, Hospital C acquiring the assets of each Hospitals A and B in exchange for the assumption of all liabilities of each hospital "appears to be a consolidation . . . requiring a determination of gain or loss . . ." (Record p. 1185) The plaintiff therefore argues that Medicare reimbursement consequences are the same whether a transaction is structured as a consolidation or an asset purchase.

Furthermore, the plaintiff challenges the government's characterization of the appraisal (Valuation Report, Plaintiff's Exhibit C) as improperly stating that "cash" and "nets receivables" were not included in the valuation. *Government's Brief* at 27. The plaintiff argues that the appraisal included all "intangible assets" which encompasses "cash" and "nets receivables." *See* e.g., *In re Pioneer Motor Serv., Inc.*, 402 F.2d 438, 439 (7th Cir.1968) (stating that the corporation's intangible assets included accounts receivable and cash). *Plaintiff's Reply Brief,* at 7 n. 8.

There is no doubt that the parties made what they call an "internal" change to the nature of the transaction between NIMHS and NIMBS. It was intended to be and was publicly called a consolidation at the onset. Thereafter, legal counsel, Mr. Baudino, informed SMHC that under current Medicare rules there would be a significant reimbursement advantage to the resulting new entity, NIMHC, by changing the nature of the transaction from a consolidation to an asset purchase (sale) which counsel opined would give NIMHS $1.5 million additional cash. Part of the plan was that SMHC was not to tell the public of the "internal" change of procedure. The government argued that this failure to disclose the $1.5 million "pot of gold" was a clear indication that the "cooperating" companies did not want new bidders to come in and ruin their cozy deal. At the PRRB hearing, Mr. Yox, when asked whether there was any possibility that North Iowa Medical Center could have sold its facility to someone other than St. Joseph's Mercy Hospital, testified that "I didn't see an opportunity for [any] other suitors." (Tr. 53–54). The government countered by saying that Mr. Yox had no background by which to make this erroneous conclusion.

The government argues attorney Baudino was wrong when he told the board we must change this transaction from a con-

solidation to an asset purchase. The government states in argument (Tr. 37) that his being right or wrong was not the issue. "The issue and the significance of this false information Mr. Baudino put out was that he and the board had a state of mind that if they would just switch to calling it an asset purchase, they had found a pot of gold." (Tr. 37). Counsel argues that the board was greedy so they promptly switched but never raised the price because of this new gold and this clearly shows significant influence by the Mercy Group over the provider argues the government. The plaintiff argues that this discovery by plaintiff/provider's attorney Mr. Baudino was perhaps something new to him, but not to the present plaintiffs who knew about the $1.5 million all along (Tr. 52) and had figured it into their prices. Therefore, it was not a major factor here. (Tr. 70–71).

Everyone agrees that Mr. Baudino was wrong when he told his board that there would be no government money paid unless the transaction was called and made to look like a sale. The fact that he didn't know the law didn't change the law.

The Court is persuaded that the fact that the transaction began as a consolidation but ended up as a sale is not evidence that there was a lack of arms length negotiations between the parties because Medicare regulations will recognize a loss under either set of circumstances. (Tr. 37, 62).

### 3. Board of Directors

■ The government points out that there were four members of plaintiff's Board of Directors who were eventually appointed by SMHC to serve on the eighteen (18) member Board of Directors of the new acquiring company, NIMHC. They also point out that one of plaintiff's officers became executive vice-president of the new acquiring NIMHC. The plaintiff argues that these appointments, however, occurred two weeks after execution of the purchase agreement and were voluntary on SMHC's part. The plaintiff points out that none of these cross-over board members held any positions at NIMHC while still holding positions with the plaintiff/Provider. Therefore, none of these five people had any conflicting duty of loyalty at any time, argues the plaintiff. Further, the plaintiff argues that these cross-over board members had no opportunity to affect the purchase price, which had already been fixed before they crossed over. Even assuming that they had conflicting loyalties, the plaintiff asserts that this was a small minority (22% of the Provider's Board) which could, in no way, exert any real (significant) control over the Provider in the face of the substantial majority of directors who had not so served and were duty bound to act in the best interests of the Provider. *Plaintiff's Reply Brief* at 4. Further, the plaintiff argues that since the four cross-over directors became only 22% of NIMHC's Board, and could be removed at any time, if they were found to be acting or voting contrary to the best interests of the acquiring company, there was little chance they would or did act inappropriately (AR 99).

The government points out that each of these cross-over board members had previously held positions of important corporate oversight in plaintiff's hospital. The government further points out that these four did not recuse themselves from the sale transaction, and contends that the chairman of the executive committee signed the purchase agreement on behalf of the plaintiff, knowing that fourteen (14) days later he would be the executive vice-president of the acquiring corporation. The government argues that the fact that the chairman of the committee of the plaintiff (Provider) agreed to join the other side's board two months prior to the sign-

ing of the agreement, compels the conclusion that the plaintiff and SMHC (Mercy) were significantly connected or associated. The government further argues that because the four cross-over directors and the officer had a conflict of interest, the remaining directors of the plaintiff (Provider) could be viewed as having breached a fiduciary duty under Delaware law by appointing or electing them. *McMullin v. Beran*, 765 A.2d 910 (Del.Sup.Ct. Nov.20, 2000). The government asserts that the less independent the Provider directors are, the more compelling the conclusion that the parties were related and the transaction was not bona fide.

It is important to realize that the appointment of the plaintiff-provider's former directors to NIMHC's Board of Directors did not occur until June 24, 1993. By that time, the purchase price had already been fixed and the purchase agreement had already been executed. As new directors, they were too late to decide those important matters.

The Court is persuaded that the four cross-over directors and the officer who became executive vice-president (*after* the transaction was completed) did not engage in a "control" situation, even assuming they had some conflicting loyalties before the transaction was completed. They did not get on the new board until the transaction was complete, at a time when their old director's job was terminated. As mentioned, they comprise only 22% of the Provider's Board, a minority which cannot exert any real control over the Provider. The substantial majority of disinterested directors are duty bound to act in the best interests of the Provider. Further, this Court finds that by disclosing their potential future positions, the cross-over board members actually complied with their duty of loyalty, which is one of the basic tenets of corporate law.

### 4. *The Foundation*

■ In the MOU, it sets out that the plaintiff here was the sole member of the North Iowa Medical Center Foundation (Foundation). The MOU explained that the Foundation will not be a part of the consolidation. The purpose of the Foundation was to raise money. All money raised by the Foundation will be given to MCH (later called NIMCH), the new acquiring corporation[5]. *PRRB Decision* at 26. The Foundation became a Class A member of the acquiring corporation with residual rights to a portion of the assets of the acquiring corporation.

The government argues that the acquiring corporation has the power to, directly or indirectly, significantly influence the actions or policies of the plaintiff (provider) and therefore had a control relationship with the plaintiff. The government concedes that the plaintiff could not direct the actions or policies of SMHC, or vice versa, however it is argued the plaintiff had the power to significantly influence the actions or policies of the organization. The government points to the Administrator's conclusion that the plaintiff (Provider) restructured the transaction in order to realize a higher selling price in an attempt to enhance the purchaser's Medicare receivables, all in an effort to act in the best interest of the new entity. (AR 13).

The plaintiff argues that the Foundation, which was both a subsidiary of the plaintiff and the Class A member of MCH–NIMHC prior to and after June 11, 1993, had no control over plaintiff whatsoever by reason of its Class A membership. Its rights

5. On or about June 21, 1993, MCH changed its name to North Iowa Mercy Health Center, Inc. (NIMHC).

were limited to receipt of a minor reversionary interest in the remote event of a dissolution and approval of changes in the certificate of incorporation and bylaws of NIMHC. See *Biloxi Regional Med. Ctr. v. Bowen,* 835 F.2d 345 (D.C.Cir.1987) (held that a reversionary interest in certain assets of a hospital upon expiration of the 25 year lease between a city and the operator of the hospital did not confer control over the hospital upon the city holding that interest.)

The Court is persuaded that the Foundation's 18.81% reversionary interest did not confer upon the Foundation any control over NIMHC, the new corporation. The reversionary interest would only occur upon NIMHC's dissolution, and such a dissolution can only occur if SMHC, as the Class B member, takes action to cause the dissolution of NIMHC. The likelihood of this happening is highly remote. As plaintiff points out in its brief at pages 14–15, NIMHC operates the only acute care hospital in Mason City, Iowa providing essential health care services to Mason City and surrounding areas. Further, the MOU clearly sets out that if NIMHC were to dissolve, the Foundation would survive the dissolution and would continue to exist and raise funds for the local community. Therefore, this Court finds that the reversionary interest held by the Foundation did not confer upon it the ability to significantly direct or influence any policies or actions of NIMHC.

### 5. *One–Time Sales Transaction*

■ The plaintiff argues that the one-time sales transaction does not create a related party relationship, citing to *South Boston Gen. Hosp. v. Blue Cross of Virginia,* 409 F.Supp. 1380 (W.D.Va.1976); *Medical Center of Independence v. Harris,* 628 F.2d 1113 (8th Cir.1980). Plaintiff argues the Administrator erroneously relied on PRM § 1011.1 in analyzing the relationship between plaintiff and NIMHC before

and after June 11, 1993. PRM § 1011.1 states:

> [i]f a provider and a supplying organization are not related before the execution of a contract, but common ownership or control is created at the time of execution by any means, the supply contract will be treated as having been made between related organizations.

PRM § 1011.1

Plaintiff points to HCFA Ruling 80–4 which confirms that the principle articulated in PRM § 1011.1 is inapplicable in the context of a one-time purchase of assets. HCFA Ruling 80–4 states, in part:

> [a]pplicability of the related organization rule which limits costs of a provider to those of its supplier is not necessarily determined by the absence of a relationship between the parties prior to their initial contracting, although this factor is to be considered. The applicability of the rule is determined by also considering the relationship between the parties according to the rights created by their contract.

HCFA Ruling 80–4

Plaintiff also cites *England Hosp., Inc., v. Arkansas Blue Cross and Blue Shield, Inc.,* PRRB Dec. No. 78–D48 (July 3, 1978), where the PRRB noted that the lack of an ongoing relationship between parties is relevant to the issue of control, but that lack of an ongoing relationship is insufficient to establish a per se ruling that there was no control. Further, in a case where the issue (control) was sole consideration of the sale price, the provider's argument that the price was set during the negotiation and execution of the supply agreements, and prior to the creation of an ongoing relationship between the parties, would be relevant.

The government argues the opposite is true, pointing to *Jackson Park Hospital*

*Foundation v. United States*, 228 Ct.Cl. 448, 659 F.2d 132 (Ct.Cl1981) where the court stated that "... the purposes of § 405.427 [the predecessor section the regulation in this case] apply equally to one-time sales and on-going relationships." *Id.* at 36, 659 F.2d 132. See *American Hospital Management Corp. v. Harris*, 638 F.2d 1208 (9th Cir.1981); see also *Stevens Park Osteopathic Hospital v. United States*, 225 Ct.Cl. 113, 633 F.2d 1373 (Ct.Cl1980) where the court distinguished this *South Boston* case by finding that the parties had been involved in a leasing arrangement prior to the sale and purchase of an asset between them; see also *Medical Center of Independence v. Harris*, 628 F.2d 1113 (8th Cir.1980).

The Court is persuaded that while a one-time sales transactions can create a related party relationship, as the government urges, this one-time transaction did not establish a related party relationship. The Court carefully weighed government's counsel's fine argument as to his 9 or 10 points of possible significant influence and found that several of them, admittedly, did not prove much. This Court must conclude that what they negotiated was a one-time transaction with no continuing relationship thereafter.

### D. Cumulative Effects

■ The government has admitted that none of its contentions about a significant relationship, standing alone, would sustain a finding that there was not a bona fide sales transaction. The government, however, argues that all of its reasons, cumulatively, support the conclusion that there was a significant association between the parties.

We are not here to necessarily propose to the court that any one of those factors was dispositive, although they might be, but at least in combination all of those factors paint a pretty compelling picture

that this was not an unrelated arm's length transaction ...

(Tr. 48).

Furthermore, the government argues that, even if these facts cumulatively do not support the conclusion that there was a significant association between the parties, the decision by the HCFA, overturning the decision by the PRRB, was not arbitrary or capricious.

The government has not cited to any case, and the Court has not come across a case, that states that where the facts, *cumulatively*, are enough to prove that the purchase agreement transaction was conducted between related parties as defined in 42 C.F.R. § 413.17, the government shall prevail. Therefore, after considering all of the facts, written briefs, oral arguments and case law, this Court concludes that on and prior to June 11, 1993, the date of the execution of the Purchase Agreement, the parties were not in a significant relationship. The Administrator's decision overturning the PRRB's decision was arbitrary and capricious and not supported by substantial evidence in the record. The plaintiff/provider's claim for the loss on the disposal of its assets is proper.

After a review of the administrative record and the applicable medicare law and policy, **THE COURT FINDS** that the parties to the transaction were not related through ownership and control, nor by common ownership as found by the administrator.

**THE COURT FURTHER FINDS** that based on all the evidence before it, the parties were not related parties.

**THE COURT FURTHER FINDS** that in their totality, the facts establish that the parties were not related so as to deny recovery, and that the transaction was an arms-length, bona fide sale.

**THE COURT FURTHER FINDS** that the sale price was negotiated and arrived

at through an arms-length transaction which would allow North Iowa Mercy to receive the 3.2 million dollar loss.

**THE COURT FURTHER FINDS** that because the provider has retained an 18.2% residual interest in North Iowa Mercy through the foundation, that that does not disqualify or disallow the plaintiff from receiving reimbursement.

**THE COURT FURTHER FINDS** that for all the reasons set out herein and the reasons set out in the PRRB's decision, which are by reference made a part hereof, the assets were sold at fair market value.

**THE COURT FURTHER FINDS** that the provider's claimed loss on the sale of depreciable assets is allowable.

**IT IS HEREBY ORDERED** that the Administrator's decision of June 28, 2000 is **reversed** because it is arbitrary and capricious and unsupported by substantial evidence in the record.

**IT IS FURTHER HEREBY OR-DERED** that for technical purposes, the plaintiff's motion for summary judgment (Docket No. 7) is **sustained.** The defendant's cross motion for summary judgment (Docket No. 18) is **denied.**

### ORDER NUNC PRO TUNC

On March 29, 2002 this Court entered an order regarding plaintiff North Iowa Medical's motion for summary judgment and defendant the Department of Health and Human Services's cross motion for summary judgment. The order is missing some language. On page 21 of the order it states:

> **IT IS HEREBY ORDERED** that the Administrator's decision of June 28, 2000 is **reversed** because it is arbitrary and capricious and unsupported by substantial evidence in the record.

The Court intended to make it clear that the case is also remanded to the Secretary with instructions that plaintiff be entitled to claim the loss of $3,256,187 on its final cost report for the 1993 fiscal year, and directing the Secretary to pay plaintiff for the interest due on the claimed loss, pursuant to 42 U.S.C. § 1395oo(f)(2).

Therefore, the following paragraphs are substituted *nunc pro tunc* for the above cited paragraph in the order of March 29, 2002:

> **IT IS HEREBY ORDERED** that the Administrator's decision of June 28, 2000 is **reversed** because it is arbitrary and capricious and unsupported by substantial evidence in the record.

> **IT IS FURTHER HEREBY OR-DERED** that this case is remanded to the Secretary with instructions that plaintiff be entitled to claim the loss of $3,256,187 on its final cost report for the 1993 fiscal year.

> **IT IS FURTHER HEREBY OR-DERED** that the Secretary shall pay the plaintiff the interest due on the claimed loss pursuant to 42 U.S.C. § 1395oo(f)(2).

**IT IS SO ORDERED.**